# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-AN-01696-SCT

*IN THE MATTER OF THE ENLARGING,*
*EXTENDING AND DEFINING THE CORPORATE*
*LIMITS AND BOUNDARIES OF THE CITY OF*
*CLARKSDALE, COAHOMA COUNTY,*
*MISSISSIPPI*

*v.*

*CITY OF CLARKSDALE, MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/14/2016 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN |
| TRIAL COURT ATTORNEYS: | J. CHADWICK MASK |
| | JERRY L. MILLS |
| | C. KENT HANEY |
| | WILLIAM MICHAEL CHAFFIN |
| | CURTIS D. BOSCHERT |
| | TUJUANA S. McGEE |
| | WILBERT LEVON JOHNSON |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JERRY L. MILLS |
| | JOHN P. SCANLON |
| ATTORNEYS FOR APPELLEE: | J. CHADWICK MASK |
| | JACOB T. E. STUTZMAN |
| | MARGARETTE MEEKS |
| NATURE OF THE CASE: | CIVIL - MUNICIPAL BOUNDARIES & ANNEXATION |
| DISPOSITION: | AFFIRMED - 01/17/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., KING AND BEAM, JJ.**

**KITCHENS, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    The Chancery Court of Coahoma County granted in part the petition of the City of

Clarksdale, Mississippi, to annex land situated in Coahoma County, Mississippi, that

surrounds the city. Coahoma County appeals, arguing that the chancellor manifestly erred by finding that the annexation was reasonable. Clarksdale cross-appeals, arguing that the chancellor manifestly erred by finding that its annexation of certain land situated north of the city was unreasonable. Finding that the chancellor's decision was supported by substantial, credible evidence and was not manifestly wrong, we affirm.

**FACTS**

¶2.     The City of Clarksdale is located in the Mississippi Delta. The Town of Lyon borders the city to the northeast. Highway 61 bypasses the city and runs along its southwest corner up to its northeast corner. On December 8, 2014, Clarksdale adopted an amended ordinance enlarging, extending, and defining its corporate boundaries; specifying the improvements to be made in the annexed area; and defining the new boundaries. *See* Miss. Code Ann. § 21-1-27 (Rev. 2015). Clarksdale filed a second amended petition for ratification, approval, and confirmation of the amended ordinance on January 14, 2015, in the chancery court. *See* Miss. Code Ann. § 21-1-29 (Rev. 2015).

¶3.     Clarksdale sought to annex five areas adjacent to its current municipal limits. Proposed Annexation Areas (PAA) 1 and PAA 2 lie north of the city and are primarily residential. PAAs 3, 4, and 5 include the Highway 61 bypass to the south and east of the city and contain land used for commercial, residential, and rural purposes. PAAs 3, 4, and 5 also include the planned Interstate 69 corridor that is expected to overlap the existing Highway 61 bypass. Lyon and Coahoma County filed answers opposing Clarksdale's annexation petition. Lyon initiated its own annexation proceeding for land including part of PAA 3. W.S.

Heaton and Elsie W. Heaton filed a petition for inclusion in the Town of Lyon of realty owned by them.

¶4. After the 2015 hearing and inspection tour, the chancellor found that, considering the twelve indicia of reasonableness, Clarksdale's annexation of PAAs 3, 4, and 5 was reasonable, but that its annexation of PAAs 1 and 2 was unreasonable. The chancellor denied the Lyon annexation and a portion of the Heaton inclusion, decisions that are not at issue in this appeal. The chancellor entered a final decree approving, ratifying, and confirming the enlargement and extension of Clarksdale's boundaries in accordance with his findings. *See* Miss. Code Ann. § 21-1-33 (Rev. 2015).

## STANDARD OF REVIEW

¶5. This Court adheres to a limited standard of review in annexation matters. ***In re City of Southaven***, 5 So. 3d 375, 376 (Miss. 2009). Appellate review "is limited to the question of whether the annexation is reasonable, under the totality of the circumstances." ***Id.*** The Court will not reverse the chancery court's findings on reasonableness unless the decision was manifestly wrong and lacked the support of substantial, credible evidence. ***In re City of Meridian***, 992 So. 2d 1113, 1116 (Miss. 2008). When conflicting, credible evidence is before the chancery court, we will defer to that court's findings. ***Bassett v. Town of Taylorsville***, 542 So. 2d 918, 921 (Miss. 1989). We will reverse only if the chancellor applied an erroneous legal standard or if the Court has a firm and definite conviction that a mistake was made. ***In re City of Hattiesburg***, 840 So. 2d 69, 81 (Miss. 2003).

**DISCUSSION**

¶6. This Court has set forth twelve indicia to guide a chancellor's determination of whether a proposed annexation is reasonable. *In re City of Jackson*, 912 So. 2d 961, 964 (Miss. 2005). These factors include

> (1) the municipality's need to expand, (2) whether the area sought to be annexed is reasonably within a path of growth of the city, (3) potential health hazards from sewage and waste disposal in the annexed areas, (4) the municipality's financial ability to make the improvements and furnish municipal services promised, (5) need for zoning and overall planning in the area, (6) need for municipal services in the area sought to be annexed, (7) whether there are natural barriers between the city and the proposed annexation area, (8) past performance and time element involved in the city's provision of services to its present residents, (9) economic or other impact of the annexation upon those who live in or own property in the proposed annexation area, (10) impact of the annexation upon the voting strength of protected minority groups, (11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and in the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy economic and social benefits of the municipality without paying their fair share of taxes, and (12) any other factors that may suggest reasonableness.

*In re City of Meridian*, 992 So. 2d at 1116. The twelve indicia must be considered together to determine whether, under the totality of the circumstances, an annexation was reasonable. *Id.* The Court also has identified a number of subfactors relevant to each indicium that "may or may not" be considered in a particular case. *See In re City of Macon*, 854 So. 2d 1029 (Miss. 2003).

¶7. Coahoma County argues that the chancellor erred by applying the indicia and subfactors as a "checklist" without evaluating the overall reasonableness of the annexation. The county contends that the chancellor's order granting the annexation listed the evidence

4

relevant to each indicium and subfactor, but failed to analyze how the evidence related to each indicium or subfactor and how it—the evidence—related to whether the annexation was reasonable under the totality of the circumstances. Reviewing the chancellor's order as a whole, we find that the chancellor not only outlined the evidence on each indicium, but also considered the reasonableness of the annexation under the totality of the circumstances. The chancellor specified that, "[a]lthough some arguments are not discussed in this opinion, reference is hereby made, and those arguments are incorporated herein by reference. Every point made by each party was considered by the court in reaching its decision." We reject Coahoma County's assertion that the chancellor simply listed the evidence under each indicium without considering the relevance of that evidence to the question of reasonableness. We now review the chancellor's findings on the twelve indicia and his conclusions that Clarksdale's annexation of PAAs 3, 4, and 5 was reasonable, but that its annexation of PAAs 1 and 2 was unreasonable.

### 1. NEED TO EXPAND

¶8. This Court has identified twelve subfactors which may or may not be considered in determining a municipality's need to expand:

> (1) spillover development into the proposed annexation area; (2) the City's internal growth; (3) the City's population growth; (4) the City's need for development land; (5) the need for planning in the annexation area; (6) increased traffic counts; (7) the need to maintain and expand the City's tax base; (8) limitations due to geography and surrounding cities; (9) remaining vacant land within the municipality; (10) environmental influences; (11) the [C]ity's need to exercise control over the proposed annexation area; and (12) increased new building permit activity.

*City of Jackson v. Byram Incorporators*, 16 So. 3d 662, 683-84 (Miss. 2009) (quoting *In*

*re City of Winona v. City of Winona*, 879 So. 2d 966, 974 (Miss. 2004). The chancellor made findings on most of these subfactors.

### A. Spillover

¶9. Michael Slaughter, a professional engineer and certified planner, gave expert testimony for Clarksdale in the area of urban regional planning and civil engineering. Slaughter considered the twelve indicia in forming his opinions. He testified that "spillover" is development that extends up to the fringes and beyond the boundaries of a municipality. Evidence established that Clarksdale had extended water and sewer services to much of PAAs 1 and 2. Slaughter posited that these services constituted spillover. He testified that, in PAAs 3, 4, and 5, spillover is present in the form of businesses, particularly Sunbelt Industrial Park (Sunbelt) in PAA 3. He explained that Sunbelt is surrounded by the city on three sides. Per an interlocal agreement, Clarksdale provides fire protection to Sunbelt, and Sunbelt also receives city water and sewer services. But Chris Watson, Coahoma County's urban and regional planning expert, testified that Clarksdale's spillover into the PAAs was minimal. While Watson recognized that several subdivisions located within the city had expanded outside the municipal boundaries, he opined that these encroachments were best characterized as urban sprawl, which is low-density development that haphazardly sprawls away from a municipality.

¶10. The chancellor recognized that PAAs 3, 4, and 5 have "considerably more" commercial development than PAAs 1 and 2. Also, the chancellor noted that PAAs 3, 4, and 5 include the Highway 61 bypass and the future Interstate 69 (I-69) corridor. The chancellor

recognized the presence in PAA 3 of Sunbelt, which enjoys city utility and fire protection services and the presence of commercial development in PAA 5. The chancellor found that several interchanges along the current Highway 61 bypass and future I-69 corridor lie partially inside and partially outside the city limits.

¶11. The chancellor concluded that "[i]n the final analysis, the presence of spillover is minimal in the PAAs." Coahoma County argues that the chancellor erred because no spillover at all exisited in any of the PAAs. Conversely, Clarksdale contends that the spillover in PAAs 1 and 2 was plentiful, not minimal. The evidence pertaining to spillover in PAAs 1 and 2 showed that Clarksdale had extended water and sewer lines into those areas that had assisted in enabling some residential development. This Court finds that the chancellor relied on substantial, credible evidence in finding that some minimal spillover occurred in all five PAAs.

### B.     Internal Growth

¶12. Clarksdale presented copious evidence of an ongoing downtown revitalization, and the chancellor found that this was credible evidence of internal growth. Coahoma County argues that the chancellor's conclusion that the downtown revitalization evidenced internal growth was erroneous because downtown revitalization does not show a need for developable land and, thus, a need to expand. We find that the chancellor did not manifestly err by finding that the presence of downtown revitalization evidenced some internal growth.

### C.     Population Growth

¶13. The evidence was undisputed that Clarksdale's population is in decline. Slaughter

admitted that Clarksdale's population is declining. Clarksdale's comprehensive plan showed that its only population gains in the past fifty years occurred through an annexation in 1992 and that the city was experiencing out-migration, which testimony established describes the phenomenon of people leaving an area. Slaughter testified that the rest of Coahoma County is experiencing more out-migration than Clarksdale. But he also testified that Clarksdale's population density was high at 1,292 per square mile, supporting a need to expand. Watson testified from United States Census data that, between 2000 and 2010, Clarksdale had lost 20 percent of its population. He said also that census estimates from April 2010 through July 2014 showed a population decline of 951 persons. Further, he testified, the population growth that Clarksdale had projected in the 1992 annexation proceeding had not occurred.

¶14.    The chancellor found that Clarksdale's population decrease was substantial and did not weigh this subfactor in favor of either party. Coahoma County argues that the chancellor erred by not weighing Clarksdale's population decline against annexation. But this Court has held that an annexation was reasonable despite the fact that the municipality's population was declining because the population density was high. *In re City of Biloxi*, 109 So. 3d 529, 542 (Miss. 2013) (citing *City of Jackson*, 16 So. 3d at 684-85). We find no manifest error in the chancellor's failure to weigh this factor against annexation.

D.    *Need for developable land*

¶15.    Slaughter testified that a need for developable land had not motivated the annexation. Rather, the purpose of the annexation was to annex PAAs 1 and 2, where the city provides utility services, and PAAs 3, 4, and 5, where the city also provides some utility services and

fire protection. According to Slaughter, a need exists in PAAs 3, 4, and 5 for uniform police and fire protection and planning and zoning due to the Highway 61 bypass and the eventual opening of I-69. Slaughter testified that the purpose of the annexation included enabling Clarksdale to encompass future economic growth occurring along the future I-69 corridor.

¶16. The evidence supported Slaughter's testimony that Clarksdale in fact has an abundance of developable land. A vacant land analysis performed by Slaughter showed that 38.5 percent of the land in Clarksdale, equating to 5.44 square miles, is vacant land unconstrained by floodplains or wetlands. Slaughter testified that a large amount of this vacant, unconstrained land is used as commercial farmland and, although classified as vacant, will not and cannot be developed without consent of the landowners. Watson agreed that Clarksdale has an abundance of vacant land and opined that it has no need for vacant land to accomplish future growth. The chancellor found no dispute that vacant, developable land existed in Clarksdale, but singled out PAAs 3, 4, and 5 as containing areas of potential economic growth related to the future I-69 corridor.

¶17. Coahoma County argues that Clarksdale's population decline, when considered with the fact that the city has no need for developable land, weighs against annexation. It points to Clarksdale's General Development Plan, updated in 2010, which provides that the 1992 annexation "provided ample frontier land for city expansion and the development of new residential, commercial[,] and industrial areas." The plan further concluded that the city had ample land for infill development but that regulatory restraints prevented construction on small vacant lots within the city, which hampered redevelopment in some neighborhoods.

9

While Clarksdale has 3,483 acres of vacant, unconstrained land, the plan projected that the city would use only 356 of those acres for new development between 2000 and 2020. Further, Watson testified that, although portions of the Highway 61 bypass were inside the city, the bypass had not developed commercially.

¶18. Clarksdale correctly contends that the absence of a need for vacant land does not defeat an annexation."[T]he fact that vacant land remains in a city does not necessarily defeat annexation." *In re City of Clinton*, 955 So. 2d 307, 315 (Miss. 2007). In fact, "annexation in various cities such as 'Southaven, Madison, and Ridgeland, which had usable vacant land of 43%, 59%, and 48%, respectively' were approved by this Court." *Id.* (quoting *In re City of Hattiesburg v. City of Hattiesburg*, 840 So. 2d 69, 85 (Miss. 2003)). Coahoma County argues that Clarksdale is the opposite of Southaven, Madison, and Ridgeland, because those municipalities were undergoing population growth and rapid absorption of land, establishing a nexus between the existing land supply and the need to expand. *See City of Ridgeland*, 651 So. 2d 548, 554-56 (Miss. 1995); *City of Madison*, 650 So. 2d 490, 496 (Miss. 1995); *In re City of Southaven v. City of Horn Lake*, 630 So. 2d 10, 18 (Miss. 1993). Because an abundance of vacant land in a municipality does not defeat annexation, the chancellor did not err in failing so to find, even in the absence of population growth. The chancellor properly evaluated this subfactor along with all of the other evidence and concluded that Clarksdale's annexation of PAAs 3, 4, and 5 was reasonable under the totality of the circumstances, but that its annexation of PAAs 1 and 2 was unreasonable.

### E. Need for Planning

¶19.    The chancellor found that a need for planning existed in PAAs 3, 4, and 5 because of the impending I-69 corridor. However, the chancellor found that Clarksdale had not established a need for planning in PAAs 1 and 2. Coahoma County argues that, because the timing of I-69 is speculative, the chancellor erred by finding that planning was necessary in PAAs 3, 4, and 5. And Clarksdale argues that the presence of residential development in PAAs 1 and 2 established a need for municipal planning in those areas.

¶20.    Clarksdale cites the testimony of Slaughter that, due to the existence of the city's water and sewer lines in PAAs 1 and 2, considerable residential development has occurred there that exists beyond the reach of Clarksdale's land-use controls. Slaughter testified that PAAs 1 and 2 would benefit from the enforcement of Clarksdale's subdivision regulations and zoning ordinances. Testimony indicated that PAAs 1 and 2 had reached a level of development at which centralized, sanitary sewers would be beneficial and that Clarksdale was ready and able to provide this service to PAAs 1 and 2. And Watson admitted that a municipality's engineering specifications should apply to areas in which it has extended utilities.

¶21.    No manifest error appears in the chancellor's decision. Clarksdale presented a compelling case for a need for planning on the extant Highway 61 bypass and future I-69 corridor in PAAs 3, 4, and 5. Clarksdale showed that, given the city's present boundaries, traffic weaves in and out of city limits along the Highway 61 bypass and future I-69 corridor. Slaughter testified that planning and zoning regulations are necessary to ensure that the

property along the bypass develops to its highest and best use. Coahoma County characterizes the coming of I-69 as "mythical," asserting that its eventual completion does not support annexation. Watson testified that the Highway 61 bypass has been built to an interstate highway standard. Malcolm Crank, the city's economic development coordinator, testified that the completion of I-69 could be ten years away, and he admitted that its actual timing was unknown. Evidence demonstrated that other portions of I-69, which will run from Canada to Mexico, have been completed in Mississippi. Although evidence established that the exact timing of the completion of I-69 along the Highway 61 bypass is unknown, the evidence raised no doubt about the eventual completion of such a highway.

¶22.    As to the need for planning in PAAs 1 and 2, Watson testified that the county's planning and zoning are sufficient for the character of those areas and their rate of development. He also testified that the city has no need to exercise planning and zoning control over the areas in the PAA to which it has extended water and sewer lines. This expert testimony constituted substantial, credible evidence supporting the chancellor's finding that no need exists for planning by Clarksdale in PAAs 1 and 2.

    F.    *Traffic Counts*

¶23.    The chancellor found that, due to discrepancies in the traffic count data submitted by both sides, the traffic count factor neither favored nor disfavored annexation. Slaughter offered testimony about his traffic count analysis to show that much of the traffic that once had traveled through downtown Clarksdale now flows along the Highway 61 bypass. But Slaughter was impeached on cross-examination by his failure to use the most recent traffic

count analysis and by errors in the underlying data caused by unreliable traffic counts conducted by the Clarksdale Police Department. The chancellor was not manifestly wrong in finding the traffic count data favored neither party.

### G. Need to expand Clarksdale's tax base

¶24. While Coahoma County sought to establish that the annexation was a mere "tax grab," Slaughter testified that Clarksdale is the "economic engine" of Coahoma County and that, with annexation, the city would benefit from additional sales tax revenues and *ad valorem* taxes that would be used to provide services to the residents. He also testified that the businesses located in PAA 3 and the subdivisions in PAAs 1 and 2 enjoyed municipal services without paying taxes. Yet evidence established that the residents of PAAs 1 and 2 did pay increased rates to Clarksdale for the water and sewer services extended by the city. The chancellor found that Clarksdale would benefit from the increased tax base provided by annexation but that this factor did not favor or disfavor annexation.

### H. Geographical limitations

¶25. Other than the Town of Lyon, the chancellor found no geographical limitations.

### I. Remaining vacant land within the municipality

¶26. The chancellor found that the evidence clearly showed that vacant land existed inside the city that could be developed, but the chancellor also found that PAAs 3, 4, and 5 contained areas of potential growth for Clarksdale "beyond the normal internal growth of the city," and that this subfactor weighed, "in part, for annexation."

13

*J.      Environmental influences*

¶27.    The chancellor made no finding on this subfactor. Clarksdale cites Slaughter's testimony that a large floodplain dissects the northern part of the city, extending into PAAs 1 and 2. Slaughter testified that the presence of this floodplain supports annexation to ensure the floodplain areas are maintained properly. But evidence was before the chancellor that the county had taken measures to maintain the area in the floodplain.

*K.      Need to exercise control over the PPA*

¶28.    The chancellor found that, due to the evidence that Clarksdale substantially had expanded utility services into the PAA and that the PAA would benefit from municipal utility control, this subfactor weighed in favor of annexation.

*L.      Building permits*

¶29.    The chancellor made no findings on this subfactor. LaFondra Johnson, Clarksdale's building inspector, testified that, from 2005 to 2015, the city issued forty-two commercial building permits and 113 new residential building permits. However, she admitted that more than half of those building permits had been issued between 2005 and 2006 and that after that period a dramatic decline in new construction occurred. Johnson and Crank testified about the city's ongoing revitalization efforts, in which numerous dilapidated homes and businesses had been demolished or renovated. Crank testified that, as of February 2015, fifty-six building renovation projects had been completed and thirty-seven were underway.

## II.    PATH OF GROWTH

¶30.    This Court has set forth the following subfactors that may or may not be considered

14

in determining whether a proposed annexation is reasonably within a municipality's path of growth:

> (1) spillover development in annexation area; (2) annexation area immediately adjacent to City; (3) limited area available for expansion; (4) interconnection by transportation corridors; (5) increased urban development in annexation area; (6) geography; and (7) subdivision development.

*City of Jackson*, 16 So. 3d at 685. A city must show only that the proposed annexation area is within a path of growth; it does not need to show that it is within the primary path of growth. *Id.*

¶31.    That all five PAAs were immediately adjacent to Clarksdale, were accessible by city streets, and had no geographic barriers was undisputed. In considering this factor, the chancellor cited his earlier finding that some spillover development existed in PAAs 1 and 2 and that subdivisions in PAAs 1 and 2 received some support from Clarksdale. The chancellor noted Watson's testimony that the utilities Clarksdale had extended into PAAs 1 and 2 could not be considered spillover and that the city was not growing in any direction, but had only potential areas of growth. The chancellor found that PAAs 3, 4, and 5 contained some spillover and that annexation of those areas was supported by the future I-69 corridor.

¶32.    Clarksdale argues that the subdivision development in PAAs 1 and 2 would not have occurred without the city's considerable expenditures to provide water and sewer services to those areas, evincing a path of growth. Certainly, "[t]his Court previously has found that the extension of water and sewer services evidences a path of growth." *City of Jackson*, 16 So. 3d at 686. Nonetheless, a municipality's investment in infrastructure does not always justify annexation. *Id.* Although Clarksdale has extended utilities to PAAs 1 and 2, we hold

15

that, in light of the other indicia of reasonableness, the chancellor's finding that the annexation of PAAs 1 and 2 was unreasonable was supported by substantial, credible evidence.

¶33.    Coahoma County argues that the chancellor erred by relying on the future I-69 corridor in considering Clarksdale's path of growth because the timing of the interstate's completion is unknown. As discussed above, the record contains substantial evidence that the eventual coming of I-69 is reality, not a myth. Therefore, the chancellor did not err by relying on the completion of I-69 in considering Clarksdale's path of growth. The evidence that spillover development has occurred and that the new interstate highway will bring further economic development supports the chancellor's finding that PAAs 3, 4, and 5 are in Clarksdale's path of growth. Additionally, Clarksdale has extended some water lines, sewer lines, and fire hydrants into PAAs 3, 4, and 5, further evincing that it has a path of growth into those areas.

### III.    POTENTIAL HEALTH HAZARDS

¶34.    The subfactors that may or may not be considered in determining whether potential health hazards exist that would impact the reasonableness of an annexation are

> (1) potential health hazards from sewage and waste disposal; (2) a large number of septic tanks in the area; (3) soil conditions which are not conducive to on-site septic systems; (4) open dumping of garbage; and (5) standing water and sewage.

*City of Winona*, 879 So. 2d at 979.

¶35.    The chancellor's analysis focused on septic tanks in the PAA. The evidence showed, and the chancellor found, that septic tanks were in use in those areas of the PAA to which

16

the city had not extended sewer lines already. Slaughter testified that the presence of septic tanks, without more, created a health hazard due to the potential that a septic tank could fail and cause effluent to seep to the surface. He testified that the soils throughout much of the PAA are not conducive to septic tanks, although the soils in PAA 1 are better than the soils south of Clarksdale. He also testified that sewage had reached the surface due to septic tank failure in PAA 4. And a homeowner verified that some septic tanks along New Africa Road in PAA 4 leak when heavy rain occurs. Greg Gearhart, a civil engineer, gave expert testimony for Clarksdale that portions of the city's sewer plan for the PAA would be completed within five years but that the project would not be finished until economically feasible, and no date certain had been fixed for any sewer system improvements in the PAA.

¶36.    No evidence was adduced of any septic tank failure in PAAs 1 or 2. Watson testified that the soil in PAA 1 is conducive to supporting the septic tanks located in that area. He opined that, although the general rule is that septic tanks are a potential health hazard, the septic tanks in PAA 1 are functioning at an acceptable level. He also opined that no existing or potential health hazards are present in the PAA that would make annexation desirable. Coahoma County argues that Clarksdale provided no evidence of the feasibility of installing sewer lines in the PAA or any time frame in which they would be installed. The chancellor relied on Coahoma County's evidence, finding that "the presence of potential health hazards was not established by the proof."

¶37.    We find that the chancellor's decision was supported by substantial, credible evidence. Other than the mere presence of some septic tanks in PAAs 1 and 2, no proof of septic tank

problems in those areas was presented. Coahoma County's evidence supports the chancellor's ultimate conclusion that annexation of PAAs 1 and 2 was unreasonable. And Clarksdale's evidence that some septic tank issues were present in PAA 4 supports the chancellor's conclusion that annexation of PAAs 3, 4, and 5 was reasonable.

## IV. FINANCIAL ABILITY

¶38. This Court has developed a list of subfactors that may or may not be considered in evaluating reasonableness related to a municipality's financial ability to make improvements and deliver promised municipal services:

> (1) present financial condition of the municipality; (2) sales tax revenue history; (3) recent equipment purchases; (4) the financial plan and department reports proposed for implementing and fiscally carrying out the annexation; (5) fund balances; (6) the City's bonding capacity; and (7) expected amount of revenue to be received from taxes in the annexed area.

*City of Macon*, 854 So. 2d at 1039. After considering these subfactors, the chancellor found that Clarksdale was financially stable and that the city could fund the municipal services necessary for all five PAAs.

¶39. This Court finds that these conclusions were supported by substantial, credible evidence. Slaughter testified that he had reviewed Clarksdale's finances and that the city is in very good financial condition. He testified that the balance of Clarksdale's general fund for the most recent fiscal year was $4,140,517. He testified that Clarksdale was in sound financial condition, considering that its expenditures budget for that year was $12,139,119 and that it had more than $4 million remaining in the general fund. He testified that the garbage fund was $1.229 million in 2013, the highest it had been since 2002. The city clerk,

18

Cathy Clark, testified that the city had budgeted $11,987,920 for expenditures for the current fiscal year.

¶40.    Slaughter reviewed the city's audits for 2009 through 2014 and the final budget for the fiscal year ending September 30, 2016. He also reviewed the assessed valuations for the city from 1997 through 2014 for real property, personal property, public-utility property, automobiles, and the total assessed valuations for each year. He testified that the assessed valuations are used to generate *ad valorem* taxes by applying the city's millage rate to the amount of assessed value. He considered Clarksdale's tax levies for its general fund and other funds in reaching his opinion. Slaughter concluded that Clarksdale had an upward trend in assessed valuation, from $62.5 million in 1997 to $87.4 million in 2014, which enhanced *ad valorem* taxes.

¶41.    Slaughter also reviewed Clarksdale's sales tax revenue history. He found that the sales tax diversion to the city had been fairly steady, with a decline in 2009 and 2010 attributable to the national economic downturn from which the city had rebounded. He found that the sales tax diversion in 2013 had been $2.8 million, slightly higher than the 2005 sales tax diversion of $2.77 million. In his opinion, the sales tax revenue history indicated that the city is in sound financial condition.

¶42.    Clarksdale submitted a list of recent equipment purchases. Slaughter reviewed this list and found that the city had made significant large equipment purchases, indicating it was buying the equipment necessary to provide a high level of services to property owners. For example, Clarksdale had purchased two new fire trucks, one for $538,537 and one for

19

$397,576. The city also had purchased three knuckle boom trucks costing approximately $129,000 each and two new street cleaners costing $193,215 each. The police chief testified that the Board of Commissioners had given the police department all the manpower and equipment it had requested.

¶43. Slaughter testified that Clarksdale has a significant available bonding capacity. Clark, the city clerk, testified that, as of September 30, 2014, the bonding capacity was $8,880,269 under the 15 percent rule. Under the 20 percent rule, the bonding capacity was $13,224,157. Clark testified that the city had issued no bonds during that fiscal year but that it had made payments on existing bonds. Slaughter testified that Clarksdale's bonding capacity was sufficient should the city need to borrow money to make improvements.

¶44. The chancellor recognized that Clarksdale had submitted a services and facilities plan for providing municipal services to the PAAs. The plan provided that no additional personnel or equipment would be necessary for providing municipal services to the PAAs, with the exception of the purchase of a knuckle boom truck and the hiring of a driver. Clarksdale planned to finance the knuckle boom truck through a lease purchase for five years at an annual cost of $28,400. The driver would receive a total annual salary and benefits of $36,632. Further, Clarksdale planned to update the comprehensive plan to include the PAA at a cost of $30,000, with an additional $10,000 to apply zoning and update the zoning map. The city planned to spend $1,807,615 to extend water to the PAAs and $5,584,039 to extend sewer service to the PAA. Slaughter emphasized that the existing water and sewer lines and the proximity of the PAA to the city supported his opinion that providing services would be

20

financially feasible. Clarksdale planned to provide street lighting to the PAA as well as garbage service and mosquito control, with no additional equipment or personnel needed.

¶45.    The evidence showed that Clarksdale provides its citizens water, sewer, and electrical utilities through Clarksdale Public Utilities (CPU). CPU provides electrical services only to those property owners in CPU's certificated area. CPU manages the utilities provided in the city and in those portions of the PAA to which the city has extended utilities. CPU's director, Ray Luhring, testified that the city's estimates for water and sewer costs were reasonable and that the city could extend water and sewer services to the PAA and maintain existing lines with no additional personnel or equipment. He also testified that CPU is no impediment to Clarksdale's provision of services to the PAA. He testified the city owns the water and sewer lines and pays for improvements while CPU operates and maintains the lines. And he testified that, if the city wants to extend utility lines into an area, CPU will do so.

¶46.    Slaughter examined the estimated projected revenue and expenditures for the PAA. Clarksdale projected that it would collect $410,622 per year in *ad valorem* tax revenue from the PAA based on the fiscal year 2015 tax levy of 74.80 mills. Relying on a letter from the Mississippi Department of Revenue, Slaughter testified that the sales tax diversion from businesses in the PAA would generate $65,973 for the fiscal year ending June 30, 2016. Slaughter testified that, from a general fund perspective, after annexation, revenue would exceed expenditures by $617,806 by year five. He testified that, due to the services that Clarksdale would provide, this was not a tax grab. Slaughter and Clark both testified that the annexation was not a tax grab and that it should finance itself.

21

¶47. Coahoma County argues that Clarksdale's general fund balance is healthy due to tax increases, not a healthy local economy. It contends that Slaughter's sales tax calculations failed to address inflation and that, in reality, sales tax diversions are decreasing, not stable. It argues that, with annexation, Clarksdale will increase its land area by approximately 50 percent, yet the city proposes to add only one employee and one knuckle boom truck. Coahoma County insists that Clarksdale needs to hire more police officers but has not budgeted for them. And Coahoma County contends that Clarksdale has not conducted a feasibility study regarding the installation of sewers in the PAA. Further, the county notes that Clarksdale will experience an immediate revenue reduction once utility customers are annexed because they no longer will be paying double rates for services.

¶48. The chancellor found,

> The evidence establishes that the City of Clarksdale is in financially stable condition; that the City of Clarksdale can fund the municipal services needed for the five PAAs. Opponents state that the present financial health of the City of Clarksdale is based on increased taxes and not on increased municipal growth. Sales tax revenues of the City of Clarksdale represent a consistent income to the city, however, the opposition counters that, when an inflation factor is applied, there is a decreasing trend in City of Clarksdale's income. The City of Clarksdale has purchased equipment to improve municipal services. The City of Clarksdale's plan for providing municipal services to the PAAs is placed in the court record as Exhibit C-105. Although, the opposition questions the workability of the plan and its lack of feasibility studies, nonetheless, a plan has been provided.

The evidence summarized above provided substantial support for the chancellor's decision that Clarksdale is in stable financial condition and could fund municipal services. Importantly, the chancellor did not award Clarksdale the entire area it sought to annex. Unlike the primarily residential PAAs 1 and 2, PAAs 3, 4, and 5 have considerably more

commercial development that can be expected to generate sales tax diversion. And PAAs 1 and 2 are the primary locations of city water and sewer services that will continue to generate double utility rates. Clarksdale Chief of Police William Whit Read testified that, with its current number of sworn police officers, the city could provide a higher level of law enforcement services to the PAA than those provided by the county. Likewise, other city officials testified to the feasibility of both financing and providing municipal services to the PAA.

¶49. The dissent, without addressing the voluminous evidence of Clarksdale's finances, decides from a comparison of the aerial maps of the 1992 annexation area and the PAAs that Clarksdale's annexation of PAAs 3, 4, and 5 is a tax grab. But, as discussed above, Clarksdale submitted substantial evidence that it is in good financial condition and does not need to annex additional land to shore up deficient finances. Similarly, in *Poole v. City of Pearl*, 908 So. 2d 728, 738 (Miss. 2005), this Court found that a proposed annexation was not a tax grab because the city could continue to fund its operations without the annexation. In *In re City of Jackson*, cited by the dissent, numerous witnesses testified that the city needed to expand its tax base to enable it to continue providing the same level of service to its present residents. *In re City of Jackson*, 691 So. 2d 978, 982 (Miss. 2007). Such is not the case here. And, unlike *In re City of Jackson*, Clarksdale "demonstrate[d] other valid reasons for annexation other [sic] than mere tax base increases," such as the city's provision of utility services and some fire protection to PAAs 3, 4, and 5 and the fact that a need exists for uniformed police and fire protection and planning and zoning in those areas. *Id.* at 983.

Although the dissent contends that Clarksdale's petition was deficient because it has not made an effort to extend infrastructure to areas it annexed in 1992, substantial evidence was before the chancellor that Clarksdale has done just that. Its expert, Watson, testified that Clarksdale had indeed done a good job providing services to the 1992 annexation area. And Clarksdale showed it already has extended water and sewer services to portions of PAAs 3, 4, and 5. Thus, unlike *In re City of Jackson*, Clarksdale *did* "make an effort to extend . . . infrastructure to the vacant, developable land within the existing boundaries and take steps to encourage development in those areas." *Id.* at 983. Further, as discussed below in the economic impact analysis, the citizens of PAAs 3, 4, and 5 will receive something of value in exchange for their tax dollars.

¶50.    We address Coahoma County's argument concerning Clarkdale's notice to citizens of a tax increase. Coahoma County contends that Clarksdale failed to comply with the mandatory public notice provisions of Mississippi Code Section 27-39-203 (Rev. 2017). Clark testified that the city's millage rate was raised from 74.8 mills in the 2014-15 fiscal year to 76.22 mills in the 2015-16 fiscal year. Clark admitted that newspaper publication of an increase in millage rate is required by statute. She explained that the total millage for 2014-15 and 2015-16 was 143.52. That amount included a millage for the city of 74.8 mills, which was raised to 76.22 mills, with the rest attributable to the school district. Clark explained that she gave no notice of the millage increase because the total millage rate of 143.52 did not change. But she acknowledged that those taxpayers outside the school district did experience a tax increase of almost two mills, of which they had not received notice.

24

¶51.    According to Mississippi Code Section 27-39-203(9), "Any governing body of a tax entity shall be prohibited from expending any funds for the applicable fiscal year until it has strictly complied with the advertisement and public hearing requirements set forth in this section." Miss. Code Ann. § 27-39-203(9) (Rev. 2017). Coahoma County contends that Clarksdale did not comply with statutory notice provisions, which will require it to issue a tax refund. Coahoma County cites *Tunica County Board of Supervisors v. HWCC-Tunica, LLC*, 237 So. 3d 115, 116 (Miss. 2017), in which this Court affirmed an order for a tax refund because the city had failed to comply with the statutory notice and public hearing requirements.

¶52.    Because the legal consequences of Clarksdale's compliance or noncompliance with the notice provisions and whether it owes a tax refund were not before the chancellor for decision in this annexation matter, they are not before this Court for decision on appeal. Coahoma County did not show that a timely lawsuit had been filed against Clarksdale based on its alleged noncompliance with statutory notice provisions. A conclusion that Clarksdale will be ordered to pay a costly tax refund would be, at this juncture, speculative.

## V.    NEED FOR ZONING AND PLANNING

¶53.    In evaluating the need for zoning and planning in the PAA, the chancellor evaluated incompatible land uses within the PAA and the needs within the PAA for building inspections, building and zoning ordinances, zoning and planning to ensure public safety and welfare, and enforcement of zoning ordinances. "This Court gives chancellors a wide latitude of discretion in analyzing whether this indicator weighs against annexation. Specifically,

'[t]his Court has approved annexations even where the City does not plan to provide zoning and planning and where the County has in force its own zoning and planning ordinances.'" ***Poole v. City of Pearl***, 908 So. 2d 728, 739 (Miss. 2005).

¶54.    The chancellor found no persuasive evidence of a need for zoning control in PAAs 1 and 2 beyond that already provided by the county. Clarksdale argues that the chancellor ignored its evidence that planning and zoning were needed in these areas. The county lacks a comprehensive plan. Slaughter testified that the county's zoning map, which had been completed in 1974, was antiquated, difficult to read, and inaccurate, citing the fact that it did not include the existing Highway 61 bypass. By contrast, Clarksdale's comprehensive plan was adopted in 2010 and does address the bypass. Slaughter testified that, particularly in PAAs 1 and 2 where the development was mostly residential, the PAA needed building inspections and code enforcement, building and zoning ordinances, and municipal-level subdivision regulations.

¶55.    Slaughter also testified that certain conditions existed in the PAA that needed remediation through municipal-level planning and zoning ordinances. He testified that the county was not enforcing its planning and zoning regulations and that substandard streets and drainage systems existed in PAA 1. He raised the concern that Clarksdale was unable to apply its engineering specifications to developments tapping into its water lines. Johnson testified that PAA 1 contained gravel roads and roads too narrow to allow the passage of emergency vehicles. Clarksdale presented evidence of its broad regulations that would apply to the PAA, including a comprehensive plan, general development plan, subdivision rules

26

and regulations, and a zoning ordinance. Johnson testified that the city's subdivision regulations would apply to new subdivisions and that her department could extend building inspection, code enforcement, and planning and zoning to the PAA. She said the city has an aggressive program and a grant in place to eliminate blight. Johnson admitted that Clarksdale must address its current zoning provisions regarding lot size because when a home on an undersized lot is demolished, new construction cannot occur on the lot under the current zoning provisions. She testified that the city had budgeted $30,000 to update the comprehensive plan and $10,000 to apply zoning to the PAA.

¶56. Watson testified that no need exists for zoning and planning in the PAA beyond what the county already provides, specifically, zoning and subdivision regulations and a building code that are appropriate for rural development. He testified that, due to the largely undeveloped character of the PAA, city planning and zoning would make little difference. Further, he took issue with the city's enforcement of its comprehensive plan. He testified that recent demolition of blighted housing had left vacant lots downtown and opined that Clarksdale's zoning regulations needed updating to ensure that new development would occur on these undersized vacant lots. He also testified regarding the blighted conditions existing throughout the city. Coahoma County submitted numerous photographs documenting these conditions, including abandoned houses, broken windows, peeling paint, graffiti, lack of maintenance, piles of trash, junked cars, piles of tires, and faded and damaged street signs. Johnson testified that some of these instances of blight had been remedied before the trial.

¶57. The chancellor's finding that the planning and zoning regulations provided by the

county were sufficient for PAAs 1 and 2 was supported by substantial, credible evidence. The evidence about the largely rural character of PAAs 1 and 2 supported the chancellor's conclusion that annexation of those areas was unreasonable. Evidence was adduced of some lack of enforcement of regulations on behalf of both city and county. The chancellor viewed the entire PAA during the inspection tour and thus observed the conditions existing in Clarksdale and in all five PAAs. The chancellor found that Clarksdale successfully had established that a need exists for municipal zoning regulation in PAAs 3, 4, and 5. The presence of businesses and industry in those areas along with the Highway 61 bypass and future I-69 supported the chancellor's conclusion that those areas reasonably would benefit from municipal level planning and zoning such as that proposed to be provided by Clarksdale.[1]

## VI. NEED FOR MUNICIPAL SERVICES

¶58. The subfactors that may or may not be considered in assessing the reasonable need for municipal services in a proposed annexation area include

> (1) requests for water and sewage services; (2) plan of the City to provide first response fire protection; (3) adequacy of existing fire protection; (4) plan of the City to provide police protection; (5) plan of City to provide increased solid waste collection; (6) use of septic tanks in the proposed annexation area; and (7) population density.

---

[1] Coahoma County argues that the chancellor's finding that planning and zoning are needed in PAAs 3, 4, and 5 conflicted with his finding concerning the Town of Lyon's annexation of part of PAA 3 that because both Lyon and Clarksdale have comprehensive zoning plans, this factor favored neither municipality. But these findings are easily reconciled. The chancellor found that planning and zoning was needed in PAAs 3, 4, and 5, and that ultimately annexation of the portion of PAA 3 by Clarksdale, not Lyon, was reasonable under the totality of the circumstances.

28

*City of Winona*, 879 So. 2d at 984 (quoting *City of Macon*, 854 So. 2d at 1041-42)).

¶59.   The chancellor found that the increase in municipal services to the PAA would not require significant increase in service personnel. The chancellor found undisputed that Clarksdale had received requests for water and sewage services in the PAAs. The evidence indicated that Sandy Acres subdivision in PAA 1 and Cypress Ridge subdivision in PAA 2 had requested water and sewer services. Clarksdale had received a request for water service from Shady Nook Convenience Store in PAA 3. Clarksdale provides water and sewer services to Sunbelt. Slaughter testified that the PAA would benefit from the full extension of water and sewer services. The chancellor found that the city planned to provide sewer service to those with septic systems but that the extant septic systems in the PAA were not a major consideration.

¶60.   Also, the chancellor accepted Clarksdale's evidence of its plan to extend fire and police protection services to the PAA. Regarding fire protection, Ty Windham with the Mississippi State Rating Bureau testified that the bureau conducts surveys of fire protection in the state. Municipalities and fire protection districts are given a rating of one, the best, to ten, the worst. The rating process evaluates the water supply, the fire department, the communications center, and fire code and building code enforcement. Windham testified that Clarksdale currently is rated Class 5. It has a twenty-four-hour, full-time professional fire department. Windham testified that Clarksdale can extend Class 5 fire protection to the PAA. He testified that Coahoma County does not have a full-time professional fire department and that it provides Class 10 fire protection services, equivalent to no fire protection at all.

¶61. Clarksdale's fire chief, Obert Douglas III, testified that the city's response time is three minutes. He testified that Clarksdale has 800 fire hydrants, that 95 percent of the PAA already has fire hydrants installed, and that the city will install hydrants where needed. He testified that it would be important for the entire Highway 61 bypass to have Class 5 fire protection. He testified about the Clarksdale Fire Department's speedy and effective response to a fire at a peanut warehouse in Sunbelt in PAA 3, which the fire department already services pursuant to an interlocal agreement. The county fire chief, Wayne Sneed, testified that the county's response time is ten minutes, and he agreed with Chief Douglas that a fire doubles in intensity and coverage every minute.

¶62. Slaughter reiterated that the Highway 61 bypass would benefit from quicker response times and from the negation of jurisdictional confusion about whether the location of a fire was in the city or the county. Slaughter also testified that the residential and agricultural areas in PAAs 1 and 2 would benefit from increased fire protection. But Watson testified that, given its low density, the PAA has no need for additional fire protection beyond the volunteer fire department operated by the county. According to Watson, "cotton fields don't need a fire department."

¶63. Regarding law enforcement, the PAA is under the jurisdiction of the Coahoma County Sheriff's Department, which is responsible for the entire county, encompassing 582 square miles. The county has twenty-two full-time sworn officers, with an average response time of between seven and ten minutes. Clarksdale Chief of Police William Whit Read testified that the Clarksdale Police Department had forty-eight sworn officers and that four new

officers had been budgeted. The department planned to buy two new sport-utility vehicles in the current fiscal year, along with new service weapons and radar units. The department's response time is two and one-half to three minutes. Both Chief Read and the sheriff of Coahoma County, Fernando Bee, agreed that increased police visibility has a deterrent effect on crime. Clarksdale submitted a plan for establishing police beats in the PAAs, but it did not include adding more sworn officers.

¶64. Evidence was undisputed that, unlike the city, the county could not provide radar services to combat speeding on the Highway 61 bypass and future I-69 corridor. Chief Read testified that jurisdictional confusion will persist if the Highway 61 bypass and future I-69 corridor are not annexed. He further testified that elimination of the jurisdictional confusion will result in faster response times in PAAs 3, 4, and 5 because determining whether the city or the county has jurisdiction before responding to an accident or emergency will no longer be necessary. Chief Read also testified that the PAA needs a higher level of law enforcement. Slaughter testified that, from an urban-planning perspective, the PAA needs increased fire and police protection.

¶65. Coahoma County argues that Clarksdale did not establish a need for increased municipal services in PAAs 3, 4, and 5. The county's expert, Watson, testified that the PAAs were too sparsely developed to need increased municipal services. He testified that, due to the sparse development, Clarksdale did not need to add more sworn officers after annexation, but that it could best use its officers to fight crime downtown. He noted testimony detailing numerous complaints of crime in Clarksdale. Clarksdale argues that its evidence of a need

31

for municipal services in PAAs 1 and 2 supported its annexation of those areas.

¶66. We find that the evidence on this indicium supported the chancellor's conclusions that Clarksdale's annexation of PAAs 3, 4, and 5 was reasonable and that its annexation of PAAs 1 and 2 was unreasonable. While the evidence showed that all the PAAs contained rural areas, PAAs 3, 4, and 5 also contained the Highway 61 bypass and future I-69 corridor. Clarksdale presented strong evidence of a need to eliminate jurisdictional confusion in the provision of emergency services on the bypass. The conclusion that the bypass and future I-69 corridor would benefit from municipal level services is a reasonable one. Further, PAAs 3, 4, and 5 have within their boundaries businesses and industry, which support the existence of a need for increased fire and police protection. While PAAs 1 and 2 contain low density residential areas that could benefit from increased fire and police protection, the need is not as strong as in PAAs 3, 4, and 5, and the chancellor was within his discretion in finding that annexation of those areas was unreasonable when considering the totality of the circumstances.

## VII. NATURAL BARRIERS

¶67. Regarding the natural barriers factor, this Court has said that "it is not a constraint upon development that establishes unreasonableness under the natural barrier concept but rather a condition that makes provision of municipal services impossible or prohibitively expensive." *In re City of Columbus*, 644 So. 2d 1168, 1175 (Miss. 1994). Consistent with the testimony of Slaughter and Watson, the chancellor found that no natural barriers existed which would impact annexation.

32

## VIII.  PAST PERFORMANCE

¶68.    The evidence on this indicium focused on Clarksdale's performance in providing municipal services since the 1992 annexation. Clarksdale presented testimony that it had fulfilled its obligations from the 1992 annexation. Arch Corley, the city engineer, testified that Clarksdale had made improvements to streets, bridges, and drainage throughout the 1992 annexation area. Buddy Bennett, with CPU, testified that Clarksdale had extended water and sewer services to virtually all of the residents of the 1992 annexation area. Slaughter testified that the city had extended Class 5 fire protection services and police beats to the 1992 annexation area.

¶69.    Coahoma County presented evidence of Clarksdale's performance failures. Although Clarksdale had committed to the hiring of consultants and to the performance of a drainage study, it had not hired such consultants, and the study consisted of Corley's merely driving around the city spotting problems. Further, Coahoma County presented ample evidence of blighted conditions in the city. And Clarksdale was seventeen years late in updating its zoning ordinances after the 1992 annexation. Nonetheless, Watson testified that Clarksdale's overall performance had been good and that, considering its performance history alone, the annexation should be approved.

¶70.    Also, several objectors to the annexation, primarily residents of PAAs 1 and 2, testified about crime problems in the city. These objectors testified that they had been victims of crimes such as automobile and home burglaries and armed robberies; several of these individuals had been victims of such crimes on multiple occasions. Objectors testified that

33

the Clarksdale Police Department often was slow to respond or simply did not respond at all. One objector had moved out of Clarksdale into the PAA specifically to escape crime. A Clarksdale resident testified that his neighborhood had hired a security service due to the police department's ineffectiveness. The objectors vehemently opposed being under the jurisdiction of the Clarksdale Police Department and expressed satisfaction with county services.

¶71. The chancellor did not weigh this indicium for or against annexation, but found that each side "ha[d] valid points of contention."

## IX.  ECONOMIC OR OTHER IMPACT ON RESIDENTS

¶72. This indicium requires evaluation of the fairness of an annexation to all parties. *In re City of Hattiesburg*, 840 So. 2d 69, 82 (Miss. 2003). "[M]unicipalities must demonstrate through plans and otherwise, that residents of annexed areas will receive something of value in return for their tax dollars in order to carry the burden of showing reasonableness." *Id.*

> [T]he Court is required to balance the equities by comparing the City's need to expand and any benefits accruing to residents from the annexation with any adverse impact, economic or otherwise, which will probably be experienced by those who live in and own property in the annexation area. The mere fact that residents and landowners will have to start paying city property taxes is not sufficient to show unreasonableness.

*City of Winona*, 879 So. 2d at 988 (citations omitted). The Court has said that "[o]nly by reviewing the annexation from the perspective of both the city and the landowner can the chancellor adequately determine the issue of reasonableness. In short, the common thread that must run through any reasonableness criteria is fairness."*City of Columbus*, 644 So. 2d at 1173 (quoting *W. Line Consol. Sch. Dist. v. City of Greenville*, 465 So. 2d 1057, 1059

34

(Miss. 1985)).

¶73.    The chancellor made no specific finding on whether this factor favored annexation. Coahoma County argues that Clarksdale has vast amounts of vacant land, that it has no need to expand, and that annexation unfairly allows Clarksdale to impose its taxes on PAA residents and property owners. The chancellor noted Clarksdale's argument that increased taxes is not a sufficient reason to deny annexation. And the chancellor recognized the municipal services Clarksdale showed would be provided to the PAA residents after annexation, resulting in lower insurance rates, reduced county taxes, reduced water rates, full-time fire and police protection and water and sewer connections, all to the benefit of the PAA's property owners. But the chancellor also recognized that the objectors, especially the ones from PAAs 1 and 2, had expressed satisfaction with county police and fire protection.

¶74.    Although the chancellor made no specific finding on whether this indicium favored annexation, the chancellor's opinion, read as a whole, indicates that he did consider fairness in determining that annexation of PAAs 3, 4, and 5 was reasonable but that annexation of PAAs 1 and 2 was unreasonable. Clarksdale showed that it would provide water and sewer services, Class 5 fire protection, and police protection throughout the PAA. Ty Windham testified that, with Class 5 fire protection, the fire insurance rates of PAA residents would decrease. Slaughter verified that fire insurance rates would decrease for everyone except agricultural landowners. The rates for city water paid by PAA property owners, now twice the rates inside the city, would decrease after annexation. And Clarksdale presented evidence of a need to expand due to some spillover, high population density, and the Highway 61

35

bypass and future I-69 corridor. The fact that numerous objectors in PAAs 1 and 2 opposed annexation and expressed satisfaction with county services supports the chancellor's decision that Clarksdale's annexation of those areas was unreasonable. Additionally, no property owner or inhabitant of PAAs 1 or 2 expressed a desire for annexation. Also supporting the chancellor's decision is the fact that some residents of PAAs 1 and 2 keep animals including horses, llamas, pigs, and chickens on their property, and ambiguity existed about whether these animals could be maintained in the city after annexation.

## X.  VOTING STRENGTH OF PROTECTED MINORITY GROUPS

¶75.  The chancellor found that Clarksdale's proposed annexation would not have any negative impact on minority voting strength. Slaughter testified that Clarksdale's minority population is 79 percent; after annexation, it would be 78 percent. He further testified that Clarksdale's minority population of voting age is 75 percent and that after annexation, it would be 74 percent. Both Slaughter and Watson testified that the annexation would have no negative impact on minority voting strength. Coahoma County avers that post-annexation minority voting strength is not a contested issue.

## XI.  BENEFIT TO PROPERTY OWNERS IN PAA WITHOUT PAYING THEIR FAIR SHARE OF TAXES

¶76.  The chancellor recognized as undisputed that PAA residents worked, shopped, attended school and church, and frequented recreational facilities inside Clarksdale. Clarksdale's mayor, Bill Luckett, testified that the residents of PAAs 1 and 2 derived all their social and economic means and benefits from the city and that most people in those PAAs work and shop in the city, using city streets and services. Slaughter testified that PAA

36

residents benefit from proximity to the city without paying their fair share of taxes, a situation that would be remedied by annexation. Watson did not dispute that PAA residents enjoy economic and social benefits without paying taxes because they work, shop, and attend church in the city, but he opined that their payment of sales taxes and rental charges for recreational facilities compensated the city for the economic and social benefits they derived from proximity to the city. The chancellor found that this factor weighed slightly in favor of Clarksdale. We find that the chancellor's decision was supported by substantial, credible evidence and, considered along with the other indicia, supported the finding that annexation of PAAs 3, 4, and 5 was reasonable and that annexation of PAAs 1 and 2 was unreasonable.

## XII.    OTHER FACTORS THAT SUGGEST REASONABLENESS

¶77.    The chancellor did not make an express finding that "other factors" weighed for or against annexation. Under this indicium, the chancellor cited the jurisdictional problems in PAAs 3, 4, and 5 generated by the fact that the path of the Highway 61 bypass and future I-69 corridor weaves in and out of the city. The chancellor considered Slaughter's testimony that Clarksdale was unable to plan for the coming of the I-69 corridor because part of it lay outside the city. But the chancellor also noted the testimony of County Administrator David Vassal that the construction of I-69 along the bypass was, at best, "mythical" and that it was unknown when the actual completion date would be determined.

¶78.    Coahoma County argues that the coming of I-69 along the bypass is "mythical" because the date of completion is unknown. It posits that, because the chancellor mentioned Vassal's testimony, the chancellor actually found that the completion of I-69 along the

37

bypass was "mythical," and thus the chancellor erred by relying on future I-69 to find that annexation of PAAs 3, 4, and 5 was reasonable. While the chancellor cited Vassal's testimony, the chancellor also recognized the jurisdictional and planning difficulties caused by the Highway 61 bypass's and future I-69 corridor's weaving in and out of the city. The chancellor also found that the future I-69 corridor created a need for city planning in PAAs 3, 4, and 5. It is clear from reading the chancellor's opinion as a whole that he viewed the presence of the Highway 61 bypass and future I-69 corridor as an important consideration in finding that PAAs 3, 4, and 5 reasonably should be annexed.

¶79. Coahoma County also argues that the chancellor erred by not considering the competing interests of the Town of Lyon in enjoying any development potential created by the Highway 61 bypass and future I-69 corridor. It cites the rule that, "[u]nder the present day circumstances where there is competition among multiple municipalities for the same land, it is essential that a chancellor evaluate the competing interests of the other city or cities when considering the twelve indicia in the totality of the circumstances." *In re City of D'Iberville*, 867 So. 2d 241, 251 (Miss. 2004). But the chancellor thoroughly considered the annexation petitions of both Clarksdale and Lyon and the arguments advanced by each, including Lyon's argument about being cut off from development along the bypass. The chancellor also evaluated the municipal services proposed to be offered by both Clarksdale and Lyon in PAA 3. We find no deficiency in the chancellor's evaluation of the competing petitions for part of PAA 3.

¶80. Clarksdale raises an "other factor" not discussed by the chancellor. Citing certain

restrictive covenants, Clarksdale attacks the chancellor's decision not to allow annexation of PAAs 1 and 2. Both Sandy Acres subdivision in PAA 1 and Cypress Ridge subdivision in PAA 2 have restrictive covenants in which the developer and successors in interest agreed to consent to annexation by Clarksdale in exchange for provision of city water. The evidence showed that the covenants were generated by Clarksdale's policy, adopted in 1981, of not extending water to any unincorporated area without the developer's agreement to future annexation by Clarksdale. Clarksdale argues that, because these are covenants that run with the land, they must be enforced.

¶81. The restrictive covenants for Sandy Acres provide that

> Declarant agrees, for himself and for his heirs, administrators, executors and assigns, including all future owners of the property or successors in interest in the property, or any part thereof, that, in the event of an annexation petition or proceedings instituted by the City of Clarksdale, Mississippi, at any future time, neither the Declarant, the future purchasers nor any successors in interest will object to or in any way oppose the annexation of Sandy Acres Subdivision or any of the individual lots therein and will, if called upon by the City to do so, execute a Waiver of Process and Entry of Appearance, agreeing to the annexation of the Sandy Acres Subdivision and the individual lots therein by the City of Clarksdale. This covenant shall run with the land, shall be binding upon all future owners of any interest therein, and shall not be subject to any (I) modification by the majority of the owners of the property pursuant to Paragraph 11 nor (ii) modification, deletion or abandonment as provided in Paragraph 12 hereof.

The restrictive covenants for Cypress Ridge subdivision are similar but allow a change or cancellation of the agreement with prior written consent of Clarksdale city officials.

¶82. This Court has held that

> [a] covenant will "run with the land" if three conditions are met: "(1) the covenanting parties must intend to create such covenant; (2) privity of estate must exist between the person claiming [a] right to enforce the covenant and

39

the person upon whom [the] burden of covenant is to be imposed; and (3) the covenant must 'touch and concern' the land in question."

*Misita v. Conn*, 138 So. 3d 138, 142 (Miss. 2014). If a covenant sets forth the restriction in clear and unambiguous language, it will be enforced. *Id.* But restrictive covenants that are void as against public policy will not be enforced. *See* **Hudson v. Morrison Heights Baptist Church**, 782 So. 2d 726 (Miss. 2001).

¶83. Clarksdale argues that the covenants run with the land, are binding, are unambiguous, and must be enforced. Clarksdale argues that the chancellor's failure to make findings on the covenants rendered his decision erroneous and requires reversal of the finding that annexation of PAAs 1 and 2 was unreasonable. But Clarksdale's argument contravenes public policy as expressed by the law of this state governing annexations. In the covenants, Clarksdale and the subdivision developers and their successors in interest agreed that Sandy Acres and Cypress Ridge would not oppose annexation. But a chancery court considering an annexation petition must evaluate the twelve indicia to determine whether annexation is reasonable under the totality of the circumstances, an undertaking that necessitates consideration of the impact of annexation on PAA residents. *In re City of Meridian*, 992 So. 2d at 1116. If this Court were to permit restrictive covenants to muzzle PAA residents, a chancellor would be unable to consider the totality of the circumstances. Further, in this case, neither subdivision is adjacent to Clarksdale, and a holding that the covenants mandated annexation of Sandy Acres and Cypress Ridge would lead to an absurd result in which disconnected chunks of PAAs 1 and 2 become part of the city, while surrounding areas remain in the county. We hold that restrictive covenants like the ones at issue in this case can

40

be considered as part of the overall evidence relevant to assessing whether an annexation is reasonable under the totality of the circumstances, but that they do not control. We find that the chancellor, who expressly stated that he considered all of the evidence presented at trial, properly considered the twelve indicia to determine whether the annexation was reasonable and that he did not err by failing to grant Clarksdale any relief based upon the restrictive covenants.

## CONCLUSION

¶84. The chancellor's decision that Clarksdale's annexation of PAAs 3, 4, and 5 was reasonable and that its annexation of PAAs 1 and 2 was unreasonable under the totality of the circumstances was supported by substantial, credible evidence and was not manifestly erroneous. The chancellor rendered his decision after carefully considering all evidence presented in light of the twelve indicia and personally viewing the PAA during the inspection tour. The chancellor appreciated the differences in character of PAAs 1 and 2 versus PAAs 3, 4, and 5, with PAAs 1 and 2 being primarily rural and residential and PAAs 3, 4, and 5 containing businesses and residences. The chancellor also took into account the Highway 61 bypass and future I-69 corridor. The dissent, without analyzing the twelve indicia under the totality of the circumstances, discusses only the evidence disfavoring annexation of PAAs 3, 4, and 5 and concludes that annexation was unreasonable. After evaluating the evidence in light of our standard of review, we find that the chancellor's decision was a reasonable one based on the evidence. Therefore, we affirm.[2]

---

[2] Coahoma County has attached a 2012 Harrison County Chancery Court judgment to its Combined Reply Brief and cites information from a 2018 Mississippi Attorney

¶85.   **AFFIRMED.**

**WALLER, C.J., KING, COLEMAN, BEAM AND CHAMBERLIN, JJ., CONCUR. MAXWELL, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., AND ISHEE, J.**

**MAXWELL, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶86.   If Clarksdale's annexation of Proposed Annexation Areas 1 and 2 was unreasonable, then its annexation of Areas 3, 4, and 5 is even more unreasonable.

¶87.   The twelve indicia of reasonableness "are not separate, independent tests which are conclusive as to reasonableness." *In re City of Jackson*, 691 So. 2d 978, 980 (Miss. 1997). Rather, they serve as a guide for the court when making an "ultimate determination"—"whether the annexation is reasonable under the totality of the circumstances." *Id.* (quoting *W. Line Consol. Sch. Dist. v. City of Greenville*, 465 So. 2d

---

General's opinion on Clarksdale's attempt to transfer funds from CPU's reserve account to the general fund. Clarksdale has filed a motion to strike the 2012 chancery court judgment and reference to the information in the Attorney General's opinion because this information was not before the chancery court, which rendered its decision before the Attorney General's opinion was issued. The motion was passed for consideration with the merits of this appeal.

Because this Court does not consider information outside the record, *Hardy v. Brock*, 826 So. 2d 71, 76 (Miss. 2002), we strike the reference to facts in a 2018 Attorney General's opinion from Coahoma County's Combined Reply Brief. But we do not strike the 2012 chancery court opinion because, like the opinions of this Court, the opinion is a matter of public record with precedential value. In support of its motion to strike the opinion, Coahoma County cites this Court's decision in *Shumake v. Shumake*, 147 So. 3d 352, 354 (Miss. 2014), in which we struck a court order that was attached to an appellate brief and not included in the record. But in *Shumake*, the appellant attempted to use the attached order to establish facts of record in the case. Here Coahoma County submits the extra-record order as precedent, not to establish the facts of this case. Therefore, this situation is distinguishable from *Shumake*, and we deny Clarksdale's request to strike the order.

42

1057, 1059 (Miss. 1985)). Both the chancellor's final judgment and the majority opinion of this Court dutifully go down the check list of each indicium of reasonableness. But neither connects the dots and articulates why, under the totality of the circumstances, annexation of Areas 3, 4, and 5 was a reasonable move for a city with a declining population and ample undeveloped land.[3]

¶88. They say a picture is worth a thousand words. And here, one need only look at "the big picture"—that is, the maps showing the land Clarksdale already annexed in 1992 and the land it now seeks to annex—to assess the reasonableness of the city's claimed need to plan for and capitalize on the future I-69 corridor.

¶89. As shown by the 1991 map below, a quarter century ago Clarksdale annexed parts of Coahoma County to ensure the city extended to the future I-69. The 1992 annexation took in what is now the interchanges of the Highway 61 bypass with Highway 6, Highway 49, and future I-69, as well as the northern half of the interchange with New Africa Road. But in the decades since, *none* of that land has been significantly developed. So to claim development along the future I-69 corridor as the need to expand is dubious at best.

---

[3] "While it is true that this Court has allowed annexations even though there is not significant population growth and/or a relatively high percentage of undeveloped land within the existing city limits," this Court has been clear that the "presence of these factors should, at the very least, be an impediment to annexation." *In re City of Jackson*, 691 So. 2d at 981.



¶90.   Skepticism grows further when one looks at the second map of Proposed Annexation Areas 3, 4, and 5 and the commercial businesses and residential properties located therein. First, these areas are not adjacent to developed areas of Clarksdale.  Instead, the city "leap frogs"[4] large swaths of undeveloped, agricultural land, reaching out to grab the nearest businesses and residences.  Second, from this map, it is clear that it is not just the land near

---

[4] In **In re City of Jackson**, "leap frog development" was also at issue—that is, "the interdispersement of large vacant tracts of land between developed portions of land."  As the objectors' expert in that case explained, having large areas of vacant land between developed portions of the city "tends to be a drain on the economy and fiscal structure of the city," because the city has to expend "significant resources to extend infrastructure into vacant areas and through vacant areas" to provide services to the developed area. ***Id.*** at 981-82.  In other words, to provide infrastructure and services to Areas 3, 4, and 5, Clarksdale would have to build and travel across large vacant areas.

the future I-69 corridor Clarksdale seeks. Instead, it is specifically and almost exclusively land that already has houses and commercial property—in other words, people and entities that can be taxed. So, I find it hard not to read this map as anything other than a "tax grab"—something this Court has always viewed critically. *See **In re City of Jackson***, 691 So. 2d at 982.



Land Use (Existing)
Proposed Annexation Area
City of Clarksdale, Mississippi

45

¶91. In *In re City of Jackson*, the capital city similarly tried to jump over undeveloped city areas to annex already developed portions of Hinds County—an effort this Court found to be unreasonable under the totality of the circumstances. *Id.* at 980-91. Instead, "[b]efore the City of Jackson [could] annex[] more land and residents for which it has had to extend infrastructure and provide services," this Court held that Jackson "should make an effort to extend that infrastructure to the vacant, developable land within the existing boundaries and take steps to encourage development in those areas." *Id.* at 983. Consistent with *In re City of Jackson*, Clarksdale should have to do the same thing. Before it annexes more land, residents, and taxable businesses for which it will have to provide additional infrastructure and services, Clarksdale should at the very minimum make an effort to develop the areas that it already annexed in 1992 along the future I-69 corridor.

¶92. Until then, to claim the need to annex to capitalize on and uniformly govern the development along the future I-69 corridor is unreasonable. Therefore, I dissent in part. While I would affirm the portion of the chancellor's judgment finding the annexation of Areas 1 and 2 to be unreasonable, I would reverse the portion of the judgment regarding Areas 3, 4, and 5 and instead render a judgment finding the annexation of these areas to be unreasonable as well.

**RANDOLPH, P.J., AND ISHEE, J., JOIN THIS OPINION.**

46