# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-AN-00418-SCT

*IN THE MATTER OF THE ENLARGING,
EXTENDING AND DEFINING THE CORPORATE
LIMITS AND BOUNDARIES OF THE TOWN OF
LEAKESVILLE, GREENE COUNTY,
MISSISSIPPI, VONCILE HOLMES, OLLIE MAE
CLAY, CHRISTINE HOLLOWAY, JIMMY
WASHINGTON, CRYSTAL COLLINS, PINCHEY
WOULLARD, JIMETRA HOLLOWAY, BRIGGETT
PETERS, MARCIA TAYLOR, LATIANA JONES,
GLENDA THOMAS, JACQUES SMITH, MARTIN
RAY SMITH AND CLIFTON THOMAS*

*v.*

*TOWN OF LEAKESVILLE, MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/16/2018 |
| TRIAL JUDGE: | HON. JAMES D. BELL |
| TRIAL COURT ATTORNEYS: | J. CHADWICK MASK |
| | CLIFTON MICHAEL DECKER |
| | JACOB THOMAS EVANS STUTZMAN |
| | ROUNSAVILLE SMITH McNEAL |
| COURT FROM WHICH APPEALED: | GREENE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | CARROLL RHODES |
| ATTORNEYS FOR APPELLEE: | J. CHADWICK MASK |
| | JACOB THOMAS EVANS STUTZMAN |
| NATURE OF THE CASE: | CIVIL - MUNICIPAL BOUNDARIES & ANNEXATION |
| DISPOSITION: | AFFIRMED - 10/24/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KING, P.J., COLEMAN AND BEAM, JJ.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     The Town of Leakesville (Leakesville) is located in southeast Mississippi and is the

county seat of Greene County. The mayor and board of aldermen of Leakesville adopted an ordinance extending and enlarging the boundaries of the town. The Greene County Chancery Court found Leakesville's annexation request to be reasonable and entered a decree approving the annexation ordinance. Ollie Mae Clay, Crystal Collins, Christine Holloway, Jimetra Holloway, Voncile Holmes, Latiana Jones, Briggett Peters, Jacques Smith, Martin Ray Smith, Marcia Taylor, Clifton Thomas, Glenda Thomas, Jimmy Washington, and Pinchey Woullard (the "Opponents") filed a notice of appeal. We find that the chancellor's approval of the annexation request was supported by the record. Therefore, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     When a municipality desires to enlarge its boundaries, the governing authorities must first pass an ordinance defining the proposed territory to be included. Miss. Code Ann. § 21-1-27 (Rev. 2015). On November 10, 2016, Leakesville's mayor and board of aldermen passed an ordinance seeking to annex two areas located in Greene County. Area 1 was located to the east of Leakesville, and Area 2 was located to the west. On November 22, 2016, Leakesville filed in the Chancery Court of Greene County a petition to enlarge its boundaries via annexation. A chancery judge set a hearing on the petition for February 7, 2017. Leakesville noticed the petition and hearing.

¶3.     The Citizens for the Betterment of Leakesville Area and individual objector Rodney J. Courtney opposed the annexation and filed their answer and affirmative defenses in response. Because each of the Greene County chancellors recused, this Court appointed

2

Special Judge James D. Bell.

¶4.     On October 19, 2017, Leakesville entered into a stipulation with the some of the opponents, agreeing to remove three areas, designated the "Settlement Area," from its proposed annexation. In return, the settling opponents agreed to withdraw their Answer and Affirmative Defenses and Objections to Leakesville's annexation of the remaining areas. The remaining areas were designated Area 1A, Area 1B, Area 1C, and Area 2, the proposed annexation areas   (the "PAA"). The remaining opponents continued to object to the annexation of the PAA. The matter proceeded to trial on November 6 and 7, 2017. Several individuals appeared without counsel to object to the annexation.

¶5.     Excluding prison population, the combined PAA consisted of 320 residents.[1] No objection was heard to the annexation of Areas 1A and 1B.[2] Several people opposed the annexation of Areas 1C and Area 2.[3] Area 1C is located to the southwest of Leakesville and includes a nursing home, Greene County High School, Jones County Junior College, and

_____

[1]Area 1A had a total population of 14. Area 1B had a population of 56. Area 1C's population was sixty-three. And Area 2 had a total population of 187. Including the prison population, the combined population of the PAA was 3,266.

[2]Area 1A is located to the northwest of Leakesville. The chancellor described Area 1A as being shaped like a "balloon on a stick" and includes Southeast Mississippi Correctional Facility and the Greene County Industrial Park (which did not include any industry at the time of trial). Area 1B is northward of Leakesville and includes a residential area.

[3]The seven objectors at trial were Don Eubanks, Janet Eubanks, Tara Eubanks, Matt Eubanks, Molly Franklin, James Sowell, and Eugene Cooper. The Opponents listed in this appeal did not contest the annexation at trial.

3

Greene County Vocational Center. It also includes agricultural land and residences belonging to some of the objectors. Area 2 is located to the east of Leakesville and includes Leakesville Elementary School, residential areas, and potential commercial areas. A new Highway 57 - 63 bypass was constructed to the east of Leakesville, across the Chickasawhay River. Area 2 follows Highway 63 southeast of Leakesville.

¶6.     Under Mississippi Code Section 21-1-33,

> If the chancellor finds from the evidence presented at the hearing that the proposed enlargement or contraction is reasonable and is required by the public convenience and necessity and, in the event of an enlargement of a municipality, that reasonable public and municipal services will be rendered in the annexed territory within a reasonable time and that the governing authority of the municipality complied with the provisions of Section 21-1-27, the chancellor shall enter a decree approving, ratifying and confirming the proposed enlargement or contraction, and describing the boundaries of the municipality as altered.

Miss. Code Ann. § 21-1-33 (Rev. 2015). The municipal authorities have the burden to show that the proposed enlargement is reasonable. *Id.* The chancellor found that Leakesville had proved the petition for the enlargement of its boundaries to be reasonable and, on January 11, 2018, entered an order approving the annexation of the PAA. The chancellor's findings are discussed more thoroughly below.

¶7.     The Opponents appeal the chancellor's decision and request that this Court reverse and remand this case to the trial court with instructions to make additional findings concerning the factors relevant to the twelve indicia of reasonableness and to redetermine the issue of reasonableness in light of all the substantial and credible evidence.

4

## ANALYSIS

¶8.     This Court's standard of review is very limited in annexation matters. *Coahoma County v. City of Clarksdale (In re City of Clarksdale)*, 267 So. 3d 236, 241 (Miss. 2019) (citing *City of Horn Lake v. City of Southaven (In re City of Southaven)*, 5 So. 3d 375, 376 (Miss. 2009)). The review is limited to whether the annexation is reasonable. *Id.* A chancellor's decision will be reversed "only if it is manifestly wrong and not supported by substantial and credible evidence." *In re City of Southaven*, 5 So. 3d at 376 (citing *Town of Marion v. City of Meridian (In re City of Meridian)*, 992 So. 2d 1113, 1116 (Miss. 2008)).

¶9.     This Court has used twelve indicia of reasonableness to determine whether a proposed annexation is reasonable. *In re City of Clarksdale*, 267 So. 3d at 241-42. These twelve factors are

> (1) the municipality's need to expand, (2) whether the area sought to be annexed is reasonably within a path of growth of the city, (3) potential health hazards from sewage and waste disposal in the annexed areas, (4) the municipality's financial ability to make the improvements and furnish municipal services promised, (5) need for zoning and overall planning in the area, (6) need for municipal services in the area sought to be annexed, (7) whether there are natural barriers between the city and the proposed annexation area, (8) past performance and time element involved in the city's provision of services to its present residents, (9) economic or other impact of the annexation upon those who live in or own property in the proposed annexation area, (10) impact of the annexation upon the voting strength of protected minority groups, (11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and in the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy economic and social benefits of the municipality without paying their fair share of taxes, and (12) any other factors that may suggest reasonableness.

*Id.* at 242 (quoting *In re City of Meridian*, 992 So. 2d at 1116). The twelve factors are not separate, independent tests but are considered together to determine reasonableness under the totality of the circumstances. *In re City of Southaven*, 5 So. 3d at 376-77.

¶10. The Opponents argue that the chancellor erred in his findings on seven of the twelve reasonableness factors and contend that the chancellor's findings in those areas were manifestly wrong and not supported by substantial and credible evidence. First, this Court considers Leakesville's need to expand.

### 1. Need to Expand

¶11. In determining the reasonableness of a municipality's need to expand, this Court has considered many subfactors, including

> (1) spillover development into the proposed annexation area; (2) the City's internal growth; (3) the City's population growth; (4) the City's need for development land; (5) the need for planning in the annexation area; (6) increased traffic counts; (7) the need to maintain and expand the City's tax base; (8) limitations due to geography and surrounding cities; (9) remaining vacant land within the municipality; (10) environmental influences; (11) the [C]ity's need to exercise control over the proposed annexation area; and (12) increased new building permit activity.

*In re City of Clarksdale*, 267 So. 3d at 242-43 (quoting *City of Jackson v. Byram Incorporators*, 16 So. 3d 662, 683-84 (Miss. 2009)). The chancellor found that the evidence overwhelmingly showed that Leakesville needed to expand. The Opponents maintain that the chancellor's findings on Leakesville's need to expand were manifestly wrong and without substantial evidence. After reviewing the evidence presented at trial on this factor, we disagree.

*(i)    Spillover Development into the PAA*

¶12.    As previously stated, spillover development is a factor to be considered when determining the reasonableness of a municipality's need to expand. The chancellor found that significant spillover development had occurred close to Leakesville's borders and that the development likely would not have occurred without the essential goods and services found in Leakesville. The Opponents argue that the trial court's determination that spillover development had occurred close to Leakesville was faulty.

¶13.    At trial, Arthur Michael Slaughter, an urban planning consultant and registered engineer with Slaughter & Associates, testified that spillover in the PAA supported annexation. Slaughter compiled a map that depicted single-family homes, mobile homes, commercial lots, schools, and churches in the PAA. He stated that spillover growth had occurred adjacent to and north of Leakesville, as well as to the east. The map showed spillover in Area 2, which included Leakesville Elementary School, Davis Hardware Building Supply, Street Racin' Haven, Southern Styles Salon, New Providence Baptist Church, Quad County Memorial Chapel, and New Covenant Ministries. Area 1A included residential development, Southland Floor Covering & Mini-Storage, Pure Station/Bernie's Pawn & Gun, the Greene County Industrial Park, and Southern Mississippi Correctional Institution. Area 1B included extensive residential development and New Hope Baptist Church. Lastly, spillover in Area 1C included Greene County High School, Jones County Junior College Greene County Center, Greene County Vo-Tech School, Turner-DuVall

7

Retirement Village, First Assembly Church of God, and Wildcat Corner. The majority of spillover development occurred in Areas 1B and Area 2; however, all of the PAA had experienced development.

¶14. The Opponents contend that the trial court ignored evidence that much of the spillover development occurred in the Settlement Area that Leakesville agreed not to annex. Accordingly, the Opponents argue that the fact that Leakesville excluded spillover development from the annexation area is indicative that the town does not have a need to expand because of spillover development. This Court previously has rejected a similar argument. *See **Gousset v. City of Macon (In re City of Macon)***, 854 So. 2d 1029, 1038 (Miss. 2003) ("Objectors argue that the 'cut out' area has not had spillover development. They argue that the 'cut out' area should be excluded from the annexation since it is not more in the path of growth than other areas excluded. These arguments are without merit. The vacant and undeveloped land in the 'cut out' area is needed for future development."). Thus, the fact that Leakesville agreed not to annex areas with spillover development does not negate the evidence presented that spillover development has occurred in the remaining PAA.

        *(ii)    Population*

¶15. The chancellor found that, although Leakesville's population is aging and declining, significant development is occurring just outside the town. The Opponents take issue with the chancellor's finding that the town's population is declining and argue that this should be an impediment to annexation.

¶16. Slaughter testified that Leakesville's population was not growing like it should be, especially for a county seat. Since 1970, Leakesville's population has averaged around 1,000 people. Between the years 2000 to 2010, Leakesville's population decreased by 128 people. However, Greene County itself has had population growth since 1970. In Greene County, the total population was approximately 8,500 in 1970. In 2010, the total population increased to 14,400.[4] He stated that the average age of Leakesville's population also is increasing. Leakesville produced an exhibit showing that in 1970, the median age of Leakesville was 26.6, while the median age of Greene County was 25.5. In 2010, the median age of Leakesville was 42.1, while the median age of Greene County was 35.7. The percentage of Leakesville's population age 65 and older was 20.2 percent in 2010. Conversely, the percentage of Greene County's population age 65 and older was 11.2 percent.

¶17. The Opponents argue that, although Leakesville's population is aging, Greene County's population also is aging and that the trial court overlooked the fact that the town sought to annex an area where the county's population is aging. The Opponents cite this Court's previous statement that the existence of no significant population growth and/or a relatively high percentage of undeveloped land within the existing town limits "should, at the very least, be an impediment to annexation." *Bunch v. City of Jackson (In re City of Jackson)*, 691 So. 2d 978, 981 (Miss. 1997). However, this Court has recognized that a "decrease in annual population growth, or even a 'decline' in overall population, does not

---

[4]Roughly half of Greene County's population increase is due to the prison population.

necessarily weight against the city's 'need for expansion.'" *City of Saltillo v. City of Tupelo (In re City of Tupelo)*, 94 So. 3d 256, 273 (Miss. 2012) (quoting *In re City of Meridian*, 992 So. 2d at 1117). As discussed in the following subfactor, the town of Leakesville consists of only 1.6 square miles of land and has a lack of developable land within the town limits. Consequently, Slaughter testified that the small size of Leakesville's town limits constrains the town's ability to grow in population.

### (iii) Need for Development Land

¶18. The chancellor found probative that Leakesville is the county seat of Greene County, yet its area covers only 1.6 square miles. The chancellor concluded that if Leakesville did not expand it would likely continue to decline to the detriment of the county and its inhabitants.

¶19. Slaughter testified that Leakesville certainly had a need for development land. He testified that, as the county seat, "you'd like to see the town of Leakesville be able to enjoy that type of growth and population growth and be able to survive and provide the needed services not only in the existing town but the Leakesville community as a whole through the annexation area." He pointed out that Leakesville has 1.6 square miles of land area, a small area for a municipality, while Greene County as a whole is 713 square miles. Slaughter stated that the PAA would allow Leakesville additional room for growth and consists of only 4.7 square miles. Mayor George Perkins also testified that Leakesville is "boxed in" and has nowhere to go.

¶20. In addition, Slaughter stated that some of the vacant land in Leakesville consisted of

floodplains and floodways, further constraining the available room to grow. Areas to the east of Leakesville also consisted of floodplains and wetlands. Slaughter admitted that certain parts of the wetlands would not be conducive to development. Those wetlands indicated a constraint to development. However, Slaughter testified that Areas 1A, 1B, and 1C were, for the most part, outside of the floodplains.

¶21. Vernon Eugene Cooper objected to the annexation at trial and testified that he owned approximately 180 acres inside the PAA.[5] Cooper argued that Leakesville was not growing and testified that he had several commercial properties for sale in Leakesville that had not generated any interest. However, Mayor Perkins testified that some of the vacant buildings within the town limits are privately owned and stated that "[m]ost of them are affluent, some of them wealthy people, and they'll tell you right quick-like: 'That's my price on renting it. If it don't rent, I don't care.'" Moreover, this Court previously has approved annexation in cities with higher vacant land available "such as 'Southaven, Madison, and Ridgeland, which had usable vacant land of 43%, 59%, and 48%, respectively.'"***Hale v. City of Clinton (In re City of Clinton)***, 955 So. 2d 307, 315 (Miss. 2007) (quoting ***Lamar County v. City of Hattiesburg (In re City of Hattiesburg)***, 840 So. 2d 69, 85 (Miss. 2003)).

     (iv)    *Need for Planning in the PAA*

¶22. The chancellor did not give specific findings on this subfactor. Slaughter reviewed

---

[5]Although Cooper owned land inside the PAA, Cooper's home was located outside the PAA.

Leakesville's Comprehensive Development Plan, Leakesville's zoning ordinances and zoning map, and a land-use map, and determined that Leakesville had a need for planning in the PAA. Slaughter testified that because Greene County did not have a comprehensive plan, zoning ordinances or maps, building codes, or building permits, there was a need for those planning services in the PAA. He stated that the principal reason that planning is important is to "protect your investment in your land and your home or your business, to help guide and direct growth in a proper manner." For example, Slaughter testified that planning helps prevent placing a correctional facility around schools or a subdivision. In addition, Slaughter testified that a comprehensive plan or zoning ordinance "helps to ensure that the property develops to its highest and best use" and protects the value of land and property.

### (v) Traffic

¶23. The chancellor did not make specific findings on this subfactor. Slaughter testified that traffic counts supported the need for annexation. Slaughter obtained data from sixteen areas both in and around Leakesville and in the PAA. He opined that traffic had increased both in the PAA and inside the town. Slaughter also stated that some areas in the PAA had experienced a decline in traffic because of the new bypass. In the areas surveyed, in the previous five years, traffic had increased in the town of Leakesville overall by 44.2 percent. Traffic had increased by 5.4 percent in the PAAs surveyed. However, the traffic data in the PAA was limited and did not include any traffic analysis of Areas 1B or 1C.

### (vi) Need to Maintain and Expand the Town's Tax Base

¶24. Slaughter testified that because Leakesville's tax base was so limited, the town had a need to expand its tax base. Slaughter also attributed Leakesville's aging population to its need to maintain and expand its tax base because residents age 65 or older are tax exempt on the first $75,000 value of their homes. Expanding the tax base additionally meant an increase in sales-tax revenue, because more people would be engaging in commerce in the town. Slaughter testified that, of the 7 percent sales tax, 18½ percent comes back to the town to spend on community services such as police, fire, and street maintenance. If a business is located outside of Leakesville, the sales tax goes to the Mississippi Department of Revenue instead of the town.

¶25. The Opponents contend that the trial court ignored Mayor Perkins's testimony in which he stated,

> We've got a bunch of buildings in town and all. People say, "Why don't y'all do something with these town—these buildings first?" Well, that's privately owned people. Most of them are affluent, some of them wealthy people, and they'll tell you right quick-like: "That's my price on renting it. If it don't rent, I don't care."
>
> So it's hard to open—I just can't—I've tried. Every—all mayors before me have tried to—to build Leakesville. We have no way to grow a tax base. We're shrinking up. Every time the census comes out, we're losing population.

The Opponents argue that Mayor Perkins's testimony shows that the sole reason the mayor and board of alderman wish to annex territory is to grow Leakesville's tax base. This Court previously has stated that "[a]lthough it has been held that a city's need to maintain or expand its tax base, especially as growth and development occurs on its perimeters, is a factor to be

13

considered when determining the reasonableness of a proposed annexation, this Court has in the past, been very critical of annexations which are in effect 'tax grabs.'" ***In re City of Jackson***, 691 So. 2d at 982 (citation omitted). This Court went on to state that the power of extending corporate limits is not to be granted for the sole purpose of increasing the income of the municipality. ***Id.*** at 983.

¶26.     However, we disagree with the Opponents' contention that Leakesville's sole reason for annexation is to grow its tax base. As previously stated, Leakesville consists of only 1.6 square miles, is the county seat of Greene County, has never before annexed territory, and has experienced spillover development close to the town borders. For those reasons, as well as the reasons stated below, we conclude that expanding the tax base was not Leakesville's sole purpose for annexation.

### (vii)     Vacant Land

¶27.     The chancellor found that, although 40 percent of Leakesville remained undeveloped, the undeveloped land mostly consisted of small parcels of land spread throughout Leakesville on which it would be difficult to construct a large development, like a shopping center or grocery store. According to Slaughter's maps, of Leakesville's 1.61 square miles, 0.65 square miles of vacant unconstrained land existed. The 0.65 square miles equals 417 acres, which is 40.4 percent of the town. However, Slaughter testified that the 417 acres is spread out in different areas throughout the town.

### (viii)    Environmental Influences

14

¶28.    Slaughter prepared a Septic Tank Suitability Map that depicts soil conditions and the suitability of septic tanks in those particular types of soils. Slaughter conducted soil-site evaluations and testified that the soils in those areas were not conducive to utilizing septic tanks and fields lines. Area 1C is rated "somewhat limited" to "very limited" as to septic tank suitability, while Areas 1A, 1B, and 2 are largely rated "very limited" as to suitability. Slaughter testified that the Mississippi Department of Health favors centralized sewer because without it, the potential for pollution increases. Leakesville planned to provide centralized sewer throughout the PAA within five years.

¶29.    However, Slaughter admitted that he was not a certified septic-tank inspector and that the septic tanks located in the PAA were not tested to determine if they were being properly maintained or if they posed a health risk.

*(ix)    Leakesville's Need to Exercise Control of the PAA*

¶30.    Wade Jeffrey Byrd, a justice court judge for Greene County, testified that he also contracted for water operations with Leakesville, as well as Southeast Greene Water Authority. Judge Byrd was also Leakesville's former public-works director and town clerk and said that he had been involved with Leakesville's water and sewer utility department for more than thirty years. Judge Byrd testified that Leakesville currently has water lines and provides water services to the PAA. He stated that Leakesville provides water to 100 percent of the existing businesses in the PAA and provides water to 94 percent of the existing residences in the PAA. Leakesville also provides sewer to three of the eight businesses

15

located in the PAA and plans to extend sewer to the remaining businesses. Leakesville provides sewer to 115 of the 178 houses in the PAA. Slaughter testified that, because the PAA has existing utility systems of water and sewer provided by the town and because they are mostly along major transportation corridors, the PAA also needs proper planning and codes in place to control future growth and development.

### (x) Building-Permit Trends

¶31. Slaughter compiled a chart of both commercial and residential building-permit trends for the town of Leakesville. In 2012, Leakesville issued eight commercial building permits, and in 2017, Leakesville issued one. In 2012, Leakesville issued nine residential-building permits, and in 2017, Leakesville issue four. Overall, from 2012-2017, Leakesville issued eighteen commercial building permits and forty residential building permits. Slaughter testified that this indicated that commercial and residential activity existed and that this factor supported the need to expand.

### (xi) Summary

¶32. Slaughter testified that, in his opinion, Leakesville had a need to expand, especially considering its limited geographical area to grow, the extension of water and sewer systems in the PAA, and Leakesville's overall plans to improve and expand those systems.

¶33. The Opponents claim that the chancellor failed to consider the twelve subfactors relevant to the need to expand. We find no merit in this contention. Although the chancellor did not specifically cite the twelve subfactors, his findings in this area considered

Leakesville's need for land, the remaining vacant land within the municipality, spillover development, Leakesville's need for developmental land, and the need to expand Leakesville's tax base. In addition, witnesses at the hearing testified as to the twelve subfactors. Therefore, the chancery court's finding that the need-to-expand factor favored Leakesville was based on substantial, credible evidence and was not manifestly wrong.

### 2. Path of Growth

¶34. A number of factors are considered in determining the reasonableness for the path of growth, including "(1) spillover development in annexation area; (2) annexation area immediately adjacent to City; (3) limited area available for expansion; (4) interconnection by transportation corridors; (5) increased urban development in annexation area; (6) geography; and (7) subdivision development." *In re City of Southaven*, 5 So. 3d at 378 (quoting *Neal v. City of Winona (In re City of Winona)*, 879 So. 2d 966, 977 (Miss. 2009)). The chancellor found that the path-of-growth factor favored Leakesville.

#### (i) Spillover Development in PAA

¶35. As previously stated, Slaughter testified that spillover growth was occurring adjacent to and north of Leakesville, as well as to the east of town. He stated that the path of development growth was following along the transportation corridors, as well as the existing utility lines. The Opponents argue that Leakesville's path of growth was in the Settlement Area and was excluded from annexation. However, an exhibit in the record shows that spillover growth is occurring in the PAA, especially in Areas 1B and 2. Also, this Court

17

previously has stated that "'a city need only show that the areas desired to be annexed are in "a" path of growth [sic] this does not mean that the area is "the most urgent or even the city's primary path of growth.'"" *In re City of Southaven*, 5 So. 3d at 378 (quoting *In re City of Winona*, 879 So. 2d at 977).

### (ii) Adjacency of PAA

¶36. Slaughter testified that all of the PAAs are adjacent and connected to Leakesville. Although the PAAs are all connected to Leakesville, Area 1A is connected to Leakesville by a thin line along the highway. The majority of Area 1A is located approximately two miles from Leakesville. In addition, Area 2 is connected by a thin strip to Leakesville. The majority of Area 2 is approximately a mile from existing town limits.

### (iii) Area Available for Expansion

¶37. The Opponents argue that Leakesville has 40 percent of its land mass available for expansion even though the town is only 1.6 square miles. While this is true, as previously discussed, the vacant land in Leakesville consists of small parcels on which it would be difficult to develop a large building such as a shopping center, and it contains floodplains.

### (iv) Interconnection by Transportation Corridors

¶38. Area 1A is accessible by going northwest along Highway 63. Area 1B is located to the north and is accessed by traveling along Old Avera Road. Area 1C is accessed from Leakesville by going southwest along Highway 57. Area 2 is accessed by traveling east along Highways 57 and 63.

*(v)       Increased Urban Development in PAA*

¶39.    Slaughter testified that Greene County Industrial Park and South Mississippi Correctional Institution are located in Area 1A. Residential development exists in Area 1B. Greene County High School, Jones County Junior College Greene County Center, and Greene County Vocational Technical School are each located in Area 1C. And Area 2 includes residential development, an all-terrain vehicle park (that includes restaurants, a concert hall, RV pads, and campsites), and Leakesville Elementary School. In addition, Slaughter testified that the extension of city utilities and municipal services also is indicative of increased urban development and shows a path of growth.

¶40.    In addition, Roger Dean Polkey, chief of the Leakesville Fire Department, testified that the Leakesville Fire Department responds to fires in the PAA. Slaughter testified that this indicates a path of growth as well.

*(vi)      Summary*

¶41.    Slaughter concluded that the PAAs "are definitely" in the Town of Leakesville's path of growth. The chancellor agreed: "[t]he annexation is along major roadways that service the Town. Spillover development has already occurred in the annexation area." The record supports the chancery court's findings on this indicium.

### 3.      Potential Health Hazards

¶42.    Because Leakesville's expert and an engineer testified that the soil in the annexation area generally was not suitable for septic systems and would benefit from a public sewer

system, the chancellor concluded that this factor favored Leakesville.

¶43. This Court looks to the following factors in determining whether any potential health hazards are reasonable: "(1) potential health hazards from sewage and waste disposal; (2) a large number of septic tanks in the area; (3) soil conditions which are not conducive to onsite septic systems; (4) open dumping of garbage; and (5) standing water and sewage." *In re City of Southaven*, 5 So. 3d at 378-79 (citing *In re City of Winona*, 879 So. 2d at 979).

¶44. The Opponents do not disagree with the chancellor's finding that the soil in the PAA was not generally suitable for septic systems and would benefit from a public sewer system. However, the Opponents argue that this fact alone does not mean that the existing septic systems in the PAA pose a potential health hazard. They argue that the suitability for septic tanks map shows that the septic tank systems do not pose a health hazard and argue that the Opponents already have countywide garbage collection.

¶45. Large areas of the PAA are without centralized sewer and use either septic tanks or some type of on-site wastewater-treatment facility. Slaughter stated,

> Septic tanks, especially those septic tanks that are in soils that are not conducive for the use of septic tanks like we have here, when you look at the overall maintenance of the septic tanks in – in general, that 75, 80 percent of them eventually fail because of lack of maintenance as well as poor soil conditions. So there's certainly potential health hazards in and of themselves especially when those two things, because of poor maintenance as well as poor soils.

Leakesville plans to expand the centralized sewer system to the PAA within five years. "This Court has held that the use of septic-tanks in the PAA may indicate possible health risks.

20

However, we have also said that this factor is rather insignificant in the overall test of reasonableness." *Lee v. City of Biloxi (In re City of Biloxi)*, 744 So. 2d 270, 280 (Miss. 1999) (citations omitted).

¶46. Franklin argued that the sewer systems provided by Leakesville in Area 2 used grinder stations that are operated by electricity. Thus, when a power outage occurs, the sewage system does not operate. However, Franklin admitted that gravity systems were costly and were not usually used except in intercity areas with dense populations.

¶47. Slaughter testified that he had seen isolated cases of open dumping of garbage in the PAA but that it was not prevalent everywhere. However, he testified that standing water due to the floodplain, floodway, and wetlands would need to be addressed on a regular basis, especially from a public-works standpoint. Slaughter stated that standing water leads to the breeding of mosquitos and drainage problems.

¶48. We find that the chancellor's findings for the potential-health-hazard factor were not unreasonable.

### 4. Financial Ability

¶49. The chancellor found that Leakesville proved its ability to make the promised improvements and to furnish the municipal services promised. The Opponents do not dispute this finding.

### 5. Need for Zoning and Planning

¶50. The chancellor found that "[w]hile in theory, certain kinds of zoning may attract

21

certain development, for the most part zoning controls and restricts development." Because the annexation area had a greater need for development than for zoning, the chancellor stated that this factor favored neither party. The Opponents argue that testimony established that new homes and development were taking place in Area 1B. Therefore, the Opponents contend that substantial and credible evidence showed that the PAA does not have a greater need for development and zoning. In addition, the Opponents state that because the chancellor did not find a need for zoning in the area, this factor should have weighed against Leakesville.

¶51. Slaughter testified that there was a need to pursue the level of existing development in the PAA, including the schools, homes, and nursing homes. He stated that the residential and commercial areas would certainly benefit from building inspections and zoning ordinances, which do not currently exist in the PAA. Slaughter additionally testified that Leakesville's comprehensive plans and zoning ordinances would help to ensure that property in the PAA develops to "its highest and best use." He stated that planning and zoning helped to ensure that buildings are located in the proper location, are properly constructed structurally, including electricity, gas lines, heating and cooling, and are properly located from a wind and fire standpoint.

¶52. James W. Sowell, a resident of Area 1C, testified that there are some people in the PAA who do not want to live within the town and do not want to be "dictated to by zoning laws or ordinances or what they can and cannot do with their land." Sowell stated that he

22

wanted to be able to use his land as he sees fit. In addition, Janet Eubanks and Sowell both argued that some of the land in the PAA is family farmland and that no businesses would be put on that land because the land would be passed down through the generations. They requested that the town redraw the annexation lines leaving their property out of the PAA.

¶53. The landowners' concerns about zoning laws and the alteration of their property uses is well founded. However, Section 7(c) of the zoning ordinance provides that, "[t]o the extent legally permissible and not in conflict with state law or the Town's zoning ordinance or other land use ordinances and/or regulations, pre-existing uses of property, including, but not limited to, agricultural, hunting, and/or recreational use, will be allowed on territory annexed into the Town." In addition, Mayor Perkins testified that, "I think under the resolution we passed, unless the owner, the landowner requests it to be rezoned, it would remain as is. So that's up to the people if they want to develop and a change on it, they will apply to have that done. But we have no intentions of doing anything like that unless it's requested by the owner. And we'll agreed to do it in writing."

¶54. The record supports the chancery court's finding that this factor favored neither party.

### 6. Need for Municipal Services

¶55. The chancellor found that this factor favored annexation. The chancellor reasoned that police services would benefit the schools and nursing home in the PAA. Leakesville already provided fire protection in the PAA, and it planned to place fire hydrants within a minimum of one thousand feet of every structure, qualifying the annexation areas to receive a better

23

fire-insurance rating. And Leakesville also showed that it would provide water and sewer to all of the annexation areas within five years.

¶56.   In assessing the need for municipal services in a PAA, the following subfactors may be considered:

> (1) requests for water and sewage services; (2) plan of the City to provide first response fire protection; (3) adequacy of existing fire protection; (4) plan of the City to provide police protection; (5) plan of City to provide increased solid waste collection; (6) use of septic tanks in the proposed annexation area; and (7) population density.

*In re City of Clarksdale*, 267 So. 3d at 254 (quoting *In re City of Winona*, 879 So. 2d at 974). The Opponents contend that Leakesville presented no evidence that residents in the PAA had requested municipal water and sewage services from the town. Further, fire protection was already being provided, the PAA already had police protection provided by the Sheriff's Department, and Greene County was already providing solid-waste collection in the area. The Opponents state that the PAA is sparsely populated and has less of a need for immediate municipal services. Lastly, the Opponents aver that the trial court failed to consider the seven factors relevant to the need for municipal services.

¶57.   Slaughter testified that Leakesville currently served all of the areas in the PAA with water services. In addition, in Areas 1C and 2, Leakesville intended to extend water mains in order to provide adequate pressure to fight fires and to improve fire-protection services. Slaughter stated that because some areas did not have sufficient water or fire hydrants, water services were especially needed from a fire-protection standpoint. As previously discussed,

24

the town also planned to extend sewer services to needed areas in the the PAA. Slaughter testified that centralized sewer is always preferable to septic tanks.

¶58. Molly Regina Franklin owned close to three hundred acres in the Leakesville area, approximately thirty acres of which was located in Area 1C. Franklin testified that the city's proposed cost of water and sewer to the PAA lacked essential elements and that the actual cost would be much more. Franklin was not qualified as an expert, however, and was not allowed to testify as to how much the actual cost would be compared to the proposed cost. In addition, Franklin argued that once the sewer system was installed, there would be a time limit for customers to connect. If a customer later decided to connect, she testified that the cost would be anywhere from $6,000 to $10,000.

¶59. Wendell Garrison, chief of police for the Town of Leakesville, testified that his department was ready to extend services to the PAA. Chief Garrison stated that the Greene County Sheriff's Department currently had jurisdiction over the high school, elementary school, the vocational technical center, and the nursing home. However, the Greene County Sheriff's Department covers a little more than seven hundred square miles, and there is a shift between approximately 3:00 a.m. and 7:00 a.m. that the sheriff's department does not have an officer on duty. During that time, the Leakesville Police Department already provides backup to the county. Chief Garrison testified that the Leakesville Police Department is staffed at all hours of the day.

¶60. Ty Russell Windham, the superintendent of the public-protection department at the

Mississippi State Rating Bureau, stated that his department "is the one that assigns the public protection classes for all the municipalities and legal fire districts created by the State of Mississippi." Windham's department assigns public-protection classes across the state on a scale of one to ten. One is the best rating, while ten is the worst. Windham testified that the lower the rating, the cheaper fire-insurance premiums are. He said that Leakesville had a Class 7 rating and that the overwhelming majority of the PAA is a Class 10 rating. Windham testified that if annexation occurred, the Class 7 rating immediately would extend to the PAA, resulting in significant homeowners' insurance premium savings.

¶61.    In contrast, Janet Eubanks stated that her insurance agent said that the lower insurance rating would not help her insurance premium. Sowell, who resides in Area 1C, testified that his insurance rate was already low and that the annexation would not benefit him either. While annexation might not lower fire-insurance premiums, the PAA would still gain additional police and fire protection, as well as water and sewer services. Therefore, the chancellor's findings for this factor were supported by substantial, credible evidence. We find no merit in the Opponents' contention that the chancellor failed to consider the seven factors relevant to the need for municipal services in the area.

### 7.    Natural Barriers

¶62.    Although the Chickasawhay River is a natural barrier between Leakesville and Area 2, the chancellor stated that an existing bridge and highway connected Leakesville to Area 2 and no other natural barriers existed in the remaining areas. Therefore, the chancellor found

that the factor still favored Leakesville.

¶63.   The Opponents state that no evidence was presented that the natural barrier would not be an impediment to the town's providing water and sewer services to Area 2. They also argue that, in case of flooding, it would be extremely difficult if not impossible for Leakesville to provide fire, police, and emergency response protection to Area 2. "Regarding the natural barriers factor, this Court has said that 'it is not a constraint upon development that establishes unreasonableness under the natural barrier concept but rather a condition that makes provision of municipal services impossible or prohibitively expensive.'" *In re City of Clarksdale*, 267 So. 3d at 256 (quoting *Robinson v. City of Columbus (In re City of Columbus)*, 644 So. 2d 1168, 1175 (Miss. 1994)).

¶64.   Slaughter testified that no natural barriers existed to make the provision of services cost prohibitive to the PAA. Slaughter stated that the Chickasawhay River to the east of Leakesville did not constitute a natural barrier because Leakesville already was providing water and sewer across the river. The opponents did not provide evidence that the provision of municipal services to Area 2 would be extraordinarily expensive or impossible. Thus, the chancellor's determination that the natural-barriers factor favored annexation was reasonable.

### 8.     Past Performance

¶65.   In finding that this factor favored Leakesville, the chancellor stated that Leakesville had "excelled in providing necessary and promised services to its citizens." The Opponents do not dispute this finding.

27

### 9. Economic Impact on Residents

¶66. The chancellor found that this factor favored neither side. He discussed that the residents in the annexations areas would be required to pay town taxes but said that Leakesville's millage rate was low and that the burden would be small. The chancellor then wrote that the Opponents had disputed Leakesville's argument that it had a better fire-insurance rating than the surrounding county and that the insurance savings should exceed the ad valorem tax increase.

¶67. As previously stated, the Mississippi State Rating Bureau creates fire-insurance rates based on classes. The classes range from the best, Class 1, to the worst, Class 10. Currently, the majority of the PAA is rated a Class 10. After annexation, the PAA should inherit Leakesville's Class 7 rating. Insurance coverage in the amount of $150,000 for a frame-construction house with a Class 10 rating would be $4,365 a year. The same house with a Class 7 rating would have an insurance premium in the amount of $1,620, a difference of $2,745 a year. The difference in homeowners' insurance premium for a Class 7 versus a Class 10 brick house would be around $1,650 a year.

¶68. For those who own land without a house in the PAA, however, annexation would increase the cost of living. For property consisting of 293.86 acres with a true value of $52,310 and an assessed value of $7,847, the city taxes imposed after annexation would equal $215.79, plus additional taxes in the amount of $208.03. County savings for that property would equal only $8.47. Overall, annexation would cost that property owner

28

$415.35. Even if annexation might raise expenses for some people, this Court previously has held that an increase in taxes for residents in the PAA is insufficient to defeat annexation. *In re City of Winona*, 879 So. 2d at 988 (quoting *In re City of Hattiesburg*, 840 So. 2d at 93).

¶69.   We find that the chancellor's determination that this factor favored neither party is reasonable.

### 10.   Impact Upon Minority Voting

¶70.   The chancellor found that the impact on minority voting would be minimal. The Opponents do not dispute this finding.

### 11.   Benefit to Property Owners in PAA Without Paying Their Fair Share of Taxes

¶71.   The chancellor found that Leakesville benefitted the county and the surrounding areas and that the town already provided fire protection to the annexed areas. The Opponents take issue with the trial court's lack of detailed findings of fact to support its conclusion on this issue. The Opponents also argue that substantial and credible testimony was offered that the PAA was already receiving adequate water services, police protection from the Sheriff's Department, and fire protection from Leakesville's volunteer fire department, whose members live outside of town.

¶72.   Slaughter testified that one of the most important benefits that the residents in the PAA receive is the fire protection from Leakesville. In addition, the PAA benefit from the existing water system Leakesville provides. Slaughter testified that the residents of the PAA

do pay water bills; however, if they were not in close proximity to the town, they would not have received water services. Slaughter further testified that the PAA also receives sanitary services because of the close proximity to Leakesville. Slaughter stated that the residents of the PAA are able to benefit from the parks and recreation, shopping, and schools located in Leakesville as well. Overall, Slaughter opined that the residents of the PAA benefitted from their proximity to Leakesville without paying the full share of the taxes that current residents and property owners were paying.

¶73. Sowell testified that some residents were not receiving clean water from the town and that the water received from the town sometimes was brown or purple. Even supposing the town provided water that occasionally was insufficient, Leakesville provided substantial and credible evidence that the residents of the PAA received benefits from Leakesville without paying the corresponding taxes.

### 12. Other Factors Suggesting Reasonableness

¶74. The chancellor found significant that Leakesville had never before expanded its borders. The Opponents do not dispute this finding. The chancellor went on to state that because Leakesville has a present population of fewer than nine hundred residents, if it did not expand then, it may never have the political or financial energy to try again. In summary, the chancellor found Leakesville's petition for the enlargement of its boundaries to be reasonable under the totality of the circumstances and therefore approved the petition.

¶75. Slaughter testified that other factors in favor of annexation were that Leakesville is

the county seat of Greene County, that Leakesville consists of only 1.6 square miles, and that Leakesville has never annexed before. In addition, the relocation of the Highway 57/63 bypass also favored annexation.

¶76.  The Opponents argue that Leakesville failed to produce a single resident or landowner of the PAA who favored annexation. However, Leakesville was not required to produce a resident in favor of annexation. Further, the record contains a letter submitted by Lila J. Terhune, which stated,

> I am the owner of two parcels of land located within the boundaries of the proposed enlargement of the corporate limits of the Town of Leakesville. These parcels are located at the southwesterly quadrant of the interchange for State Highways 57 and 63. . . . I wish to express my full support of the proposed enlargement and extension of the town's corporate limits. It is my opinion that the benefits of municipal services outlined in Section 6 of the petition filed by the Town of Leakesville on December 12, 2016 will be of significant benefit to all residents and landowners within both the existing and expanded limits of the town. Additionally, it is my belief that extending the town's boundaries to the highway interchange will facilitate the provision of needed commercial services to motorists traveling along Routes 57 and 63. . . .

## CONCLUSION

¶77.  Although we understand the concerns of the Objectors, this Court has a limited scope of judicial review in annexation cases. The chancery court's findings were supported by substantial and credible evidence and were reasonable. Therefore, we affirm the chancery court's decision approving Leakesville's annexation of PAAs 1A, 1B, 1C, and 2.

¶78.  **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**